J. Robert Forshey
State Bar No. 07264200
Matthew G. Maben
State Bar No. 24037008
Kristin Schroeder
State Bar No. 24037452
FORSHEY & PROSTOK, L.L.P.
777 Main Street, Suite 1290
Fort Worth, Texas 76102
(817) 877-8855 ● (817) 877-4151 FAX
Email:  bforshey@forsheyprostok.com
Email:  mmaben@forsheyprostok.com
Email:  kschroeder@forsheyprostok.com

ATTORNEYS FOR WESTERN REAL ESTATE EQUITIES, LLC

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 10-45097-DML-11** |
| | § | |
| **VILLAGE AT CAMP BOWIE I, L.P.** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |

**WESTERN REAL ESTATE EQUITIES, LLC'S OBJECTION
TO CONFIRMATION OF THE DEBTOR'S SECOND AMENDED PLAN OF
REORGANIZATION AND RENEWED MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

TO THE HONORABLE D. MICHAEL LYNN, UNITED STATES BANKRUPTCY JUDGE:

Western Real Estate Equities, LLC ("Western" or "Noteholder"), creditor and party in interest in the above-referenced case, hereby files this Objection ("Objection") to the confirmation of the Village at Camp Bowie I, L.P. ("Debtor")'s *Second Amended Plan of Reorganization of Village at Camp Bowie I, L.P.* (docket no. 247) (the "Plan").  Western respectfully requests that this Court take judicial notice of the prior pleadings, as well as the testimony given and exhibits admitted at the hearings held during the pendency of this bankruptcy case, including the seven hearing days on Western's Motion for Relief from the

1

Automatic Stay and Motion for Valuation.[1]  Along with that evidence, in support of its Objection, Western respectfully states as follows:

## I. Preliminary Statement

1.      This is not a reorganization case.   The Debtor has testified that it filed this chapter 11 proceeding for one reason, to protect its equity holders' ownership interests.  The Debtor has no employees, less than $60,000 in unsecured debt,[2] and no other business or assets other than the Property.[3]   Western has agreed to pay the unsecured creditors in full if granted leave to foreclose.[4]  Western holds over 99.8% of the debt, yet the Debtor is attempting to cramdown its Plan[5] by artificially impairing the less than one percent (1%) of remaining debt to saddle Western with a new note.  The New Western Note (as defined in the Plan)[6] is a three (3)-year forced forbearance tied to a Plan without a viable exit strategy and a complete lack of evidence that the Debtor will have the ability to amortize the debt in the fourth and fifth year of the Plan.  Thus, the Debtor is not attempting to reorganize, but rather, to force Western, via a chapter 11 cramdown, to accept a three (3)-year, below-market interest-only extension of the Notes.

2.      The Plan has not been proposed in good faith.  As noted above, the Debtor's admitted purpose for this bankruptcy is to protect its owners' equity interests.  In support of that

---

[1] The evidence adduced at the hearings on Western's Motion for Relief from Stay and Adequate Protection (docket no. 28) ("Lift Stay Motion") are referred to herein by the exhibit numbers used at those hearings.  The Lift Stay Motion and the Western's Motion for Valuation (docket no. 50) were heard by the Court over seven hearing dates: (i) November 22, 2010, (ii) November 30, (iii) December 16, 2010, (iv) January 7, 2011, (v) January 26, 2011, (vi) February 28, 2011 and (vii) March 3, 2011 (collectively, the "Lift Stay Hearings").  Citations to the transcripts will be numbered chronologically.

[2] *See* Second Amended Schedule F (docket no. 218).

[3] The evidence adduced at the Lift Stay Hearings established that the Debtor is a single asset real estate debtor.  *See, e.g.,* Transcript of Proceedings before the Honorable D. Michael Lynn, United States Bankruptcy Judge, Case 10-45097, November 22, 2010 ("Transcript I"): 75:9-24.

[4] Transcript I: 41:7-17.  In addition, as discussed at prior hearings in this case, Western is agreeable to taking a deed in lieu of foreclosure as an alternative to foreclosing on the Property.

[5] *See also* Second Amended Disclosure Statement with Respect to Second Amended Plan of Reorganization of Village at Camp Bowie I, L.P. (docket no. 246) ("Disclosure Statement").

[6] Capitalized terms used herein that are not separately defined shall have the meaning ascribed to them in the Plan or Disclosure Statement.

goal, and in blatant disregard for this Court's guidance, the Plan proposes a twelve percent (12%) annual return to equity (paid quarterly), more than double that of the cramdown below-market interest-only treatment of the 99.8% of the debt held by Western. In addition, the Debtor admittedly has the funds and the ability to pay the unsecureds in full on the Effective Date. While the Plan does not propose to pay interest on unsecured claims, holders of Preferred Equity will receive its first $30,000 dividend prior to the unsecured creditors being paid in full. The end result of the Plan is not consistent with the objectives and purposes of the Bankruptcy Code, and therefore, no finding of good faith under section 1129(a)(3) can be made on this record.

3.       Further precluding a finding of good faith is the Debtor's artificial, and *de minimus,* impairment of the unsecured class of claims without any business justification. The three (3) month "impairment" of Class 2 is only to garner an accepting impaired class by which to attempt cramdown of Western's secured claim. The Debtor has admitted that payment of the unsecureds in full on the Effective Date would cause no hardship to the Debtor. Accordingly, the artificial impairment of Class 2 defeats the Debtor's ability to meet the tests set forth in both section 1129(a)(3) and (a)(10) of the Bankruptcy Code.

4.       The Plan is not fair and equitable. Distilled, the Plan contemplates paying holders of Preferred Equity a quarterly twelve percent (12%) dividend while holding Western in forbearance with interest-only payments at a below-market cramdown rate of 5.83% for the first three (3) years of the Plan. Under no application of section 1129(b)(2)(A) does this lopsided treatment of Western's secured claim, as compared to the treatment of new equity, meet the standard for nonconsensual confirmation.

5.       The Plan is not feasible. It contemplates a cash infusion of $1 million, yet the valuation evidence before the Court established a minimum infusion of $2 million would be required to get the Property to stabilization. The Debtor will be unable to amortize any of Western's debt if it fails to stabilize the Property, yet it does not have adequate cash in hand to

do so, and the evidence before this Court is that $1 million is woefully inadequate.[7]  In addition, Western has filed its *Motion for Determination of the Amount of its Secured Claim and for Allowance of Interest, Reasonable Fees, Costs and Charges Thereon Pursuant to 11 U.S.C. Section 506(b)* ("506(b) Motion"), in which it asks the Court to determine that its Allowed Secured Claim is not less than $33,709,322.33.  Along with the Debtor's attorneys' fees, likely underestimated at $185,000, the Allowed Secured Claim of Western dooms the feasibility of the Plan because, based on the Debtor's current projections, the Debtor will run out of cash by the end of the first year even before the full amount of administrative costs are taken into account.

6.     The Debtor has no exit strategy.  Rather, the Plan's forced forbearance with a "hope" of refinancing, a "reorganization plan" in name only, offers only illusory options.  While the Debtor contemplates refinancing, the Debtor has been unable to do so in the past, and has failed to adduce any non-speculative evidence to support any viable refinancing option five (5) years hence when its loan to value ratio will likely remain the same, at more than 95%.  Second, the Debtor's proposed collateral release provision is a similarly illusory exit strategy.  It requires the Property to appreciate approximately thirty percent (30%) above stabilized value for the formula to allow for any release of Western's collateral.  Thus, nothing under the Plan will march the Debtor forward through a reorganization of its debts; rather, the Plan is a 3-year halt, a marching-in-place, while Western bears the risk of depreciation and Plan default.  The Debtor has no evidence in support of its ability to refinance five-years hence, when it will have amortized a miniscule amount of the $33 million debt to Western.

7.     The Debtor cannot meet the test under section 1129(a)(9) given that its projections do not adequately address its professionals' fees, which are undoubtedly in excess of $185,000.  The Debtor's Plan proposes payment in full in cash as soon as practicable after

---

[7] Illustrative is the $250,000 cash outlay the Debtor recently proposed to fund one new tenant's leasehold improvements.  *See* Debtor's Emergency Motion for Authority to Enter Into Lease with Gateway Diagnostic Imaging, LLC in the Ordinary Course of Business Pursuant to Bankruptcy Code Sections 105 and 363 (docket no. 232); Western Real Estate Equities, LLC's Objection to Proposed Lease for 6115 Camp Bowie Boulevard (docket no. 234).

the Effective Date, yet the Debtor has not set forth in the projections or the Plan any schedule or proposed payout of the significant amount of fees incurred in this case.

8.  The Plan contains impermissible releases and an injunction against pursuit of non-debtor third parties.  These proposed provisions violate well-established Fifth Circuit law. The Plan also proposes as part of the Plan Supplement a New Western Note and Deed of Trust without addressing the cost of a new title policy, which will be required if the two Notes are merged into one.  The cost of this policy is not insignificant.  Moreover, the Debtor has not addressed to Western's satisfaction the requirements for the new debt documents.

9.  In sum, the Debtor has proposed an unconfirmable Plan designed solely to benefit the equity owners of the Debtor.  The testimony at trial will confirm that now, and in the future, the only possible method by which the Debtor can amortize its debt is to use a bankruptcy cramdown to obtain an interest rate far beneath that available in the market. Because this is not a case where the Debtor is reorganizing, but rather using chapter 11 to force Western to accept an additional three (3)-year forbearance, lifting the stay to enable Western to obtain its collateral is the most equitable and efficient option to resolve this bankruptcy proceeding.  In the almost seven (7) years since the Debtor originally financed the purchase of the Property, not one penny of principal has been paid.  Indeed, the Notes have been in interest-only forbearance since February of 2006.  After maturity in February 2010, the Debtor made no payments between May 2010 and November 2010.  The Debtor admits that its current cash position is a function of its failure to pay interest on the Notes for those months.[8]

## II.    BACKGROUND

10. The Debtor, a single asset real estate debtor,[9] filed this chapter 11 proceeding to protect its equity holders' ownership interests and to halt the foreclosure of Western's lien,[10]

---

[8] Transcript I: 159:19-22.

[9] Transcript I: 75:9-24.

which secured in excess of $31 million in debt as of the Petition Date; now, that debt is in excess of $33 million.

11.     Western's claim against the Debtor is pursuant to certain promissory notes (the "Notes")[11] the Debtor executed to borrow under a construction loan obtained in January of 2004. Subsequent to the original borrowing, Western became successor-in-interest to the original noteholders.  The Notes have been in forbearance since 2006 and matured in February of 2010.

12.     The Debtor's asset is known as the Village at Camp Bowie and is a mixed use real estate development located in Fort Worth, Texas, on Camp Bowie Boulevard near the entrance to Ridglea Country Club (hereinafter, the "Property").  The Property embodies several spaces for retail and offices, including the Frost Bank Building at 6115 Camp Bowie Blvd., and 6200 Camp Bowie Blvd., 6323 Camp Bowie Blvd., 3501 Bernie Anderson, 6201 Sunset Drive and certain non-income-producing property.

13.     At maturity, the principal amount owed by the Debtor on the Notes was $31,292,824.00.  Since that time, interest and other charges arising under the Notes have accrued.[12]  The Debtor admits that the debt is approximately $1.5 million higher than the debt at

---

[10] The Debtor admits that it filed this proceeding to halt the foreclosure.  *See* Debtor's Response in Opposition to Western Real Estate Equities, LLC's Motion for Relief from the Automatic Stay and Adequate Protection (docket no. 45) ("Response to Lift Stay Motion"), p. 3 of 7, ¶ 9.

In addition, at the Lift Stay Hearings, Woodrow "Bo" Brownlee, the Debtor's principal, testified that the Debtor was seeking protection of the Debtor's ownership from foreclosure.  Transcript I: 91:24-92:18. Mr. Brownlee agreed that the "only reason" to file the bankruptcy was to protect the partners from losing their investment.  *See id.* at 92:15-18.

[11] The Notes have at all times been secured by a first priority, properly perfected Deed of Trust lien on and security interest in the land, personal property and fixtures on the Property.  The Notes are further secured by an Assignment of Rents and Leases.  Western's security interests in the Property and its rents were properly perfected prior to the commencement of the Debtor's bankruptcy case.  *See* Notice of Perfection of Liens Pursuant to 11 U.S.C. § 546(a) (docket no. 27).

[12] The outstanding balance under the Notes at the non-default contract rate with no late fees charged is $31,933,000, which is further subject to a 1.5% exit fee.  Even without the exit fee and any additional amounts added to Western's Allowed Secured Claim under section 506(b), when subtracting a reasonable 2.5% cost of sale, only a razor-thin equity cushion (if it could be called a "cushion") remains. As the Debtor has not yet paid its 2010 property tax assessment in full, the unpaid 2010 taxes of $332,139 consume the last dollars of the Property's value.  Even if some dollars remained as "equity" to fully secure Western, under section 506(b) of the Bankruptcy Code, any remaining equity is swallowed in

maturity.[13]  The Property has been posted for foreclosure no less than three (3) times, and

because the Debtor defaulted on its payment obligations subsequent to Western's purchase of

the Notes, Western posted the Property for foreclosure sale on August 3, 2010.  The Debtor

filed its chapter 11 petition on the eve of foreclosure.

14.     Cash flow is insufficient to provide debt service of Western's debt,[14] as the

Debtor has not paid one penny of principal on the obligation in over seven (7) years of

ownership.[15]  The Debtor has no employees[16] and has scheduled approximately $60,000 of

outstanding unsecured debt, which Western has agreed to pay if granted leave to foreclose.[17]

### III.     Procedural History

15.     On August 10, 2010, Noteholder filed its Lift Stay Motion, seeking to lift the stay

pursuant to sections 362(d)(1), (d)(2) and (d)(3) of the Bankruptcy Code.  As stated in the Lift

Stay Motion, and as supported by the evidence at the Lift Stay Hearings, the Debtor has little to

no equity in the Property and cannot effectively reorganize.  Even if the Debtor has a small

amount of equity in the Property, the addition of interest, transaction costs and any applicable

section 506(b) costs and fees will likely swallow any equity in full.[18]  While this Court has

---

whole by the interest on Western's claim and its costs and fees.  *See* Proof of Claim No. 24-1; *see also* Updated Noteholder Exhibit 15.

[13] *See* Disclosure Statement, p. 11.  Therein, the Debtor admits that Western's Allowed Secured Claim (as defined in the Disclosure Statement and Plan) may be higher, at $32,880,905.  *See id.*

[14] At the hearing on January 26, 2011, Paul French, Western's expert, testified that based on the Debtor's cash collateral budget actuals, the Debtor was $39,000 short of the monthly interest-only payment on the Notes.  Transcript V: 132:8-15.  Mr. French testified that the Debtor's increase in net cash flow after December was a result of the Debtor not spending any money on tenant improvements and leasing commissions.  Consequently, Mr. French's conclusion was that going forward as normalized, the Debtor would "still have difficulty making the 5.83% interest-only payment."  Transcript V: 134:1-7.

[15] Transcript IV: 52:20-25; 53:19-20.

[16] Transcript I: 76:23-25.

[17] *See* Second Amended Schedule F (docket no. 218).

[18] *See* Western's Updated Exhibit 15.  This exhibit contains the updated amount of fees and expenses incurred by Western since the commencement of the Lift Stay Hearing.  *See also* Western's Proof of Claim and the 506(b) Motion.

intimated that it may find "little" equity in the Property, Western's position is that any existing equity has evaporated.

16.     The Debtor filed its original Plan and Disclosure Statement on November 29, 2010, three (3) days prior to the expiration of the Debtor's exclusive period provided by section 1121(b) of the Bankruptcy Code.  Western objected to the original Disclosure Statement.[19]   The Debtor's first extended exclusive period within which to solicit acceptance of the Plan ended on January 31, 2011.[20]  By agreement of the parties, the Debtor's exclusive period was extended until the "conclusion" of the hearing on Western's Lift Stay and Valuation Motion.[21]  These hearings concluded on March 3, 2011; however, the Court orally granted a two (2)-week extension of the Debtor's exclusive solicitation period.  This further extension terminated on March 17, 2011; however, the Court granted a further extension of exclusivity until May 19, 2011.

17.     The Court ruled that if the Debtor cannot convene its confirmation hearing by May 19, 2011, the Court would grant Western's requested relief and lift the automatic stay.

18.     Also, at the conclusion of the hearing on the Debtor's *Second Motion to Extend Exclusive Period to Confirm Debtor's Plan of Reorganization*, held March 22, 2011, the Court informed the parties that the Debtor's then-current Plan was not confirmable and the proposed $600,000 capital infusion was inadequate.[22]  The Debtor was directed to file an amended plan and disclosure statement that satisfied certain minimum requirements set by the Court.  As set forth below, Western objects to confirmation of the amended Plan for several reasons, most

---

[19] *See* Western Real Estate Equities, LLC's Objection to Disclosure Statement with Respect to Original Plan of Reorganization of Village at Camp Bowie I, L.P. (docket no. 148); *see also* Western Real Estate Equities, LLC's Objection to Debtor's First Amended Plan of Reorganization and First Amended Disclosure Statement and Renewed Motion for Relief from the Automatic Stay (docket no. 243).

[20] *See* 11 U.S.C. § 1121(c)(3).

[21] *See* Order Extending Exclusive Period to Confirm Debtor's Plan of Reorganization for a Limited Time (docket no. 173).

[22] *See* Transcript VII (in two parts), part 1: pp. 2-4.

important of which is that the Debtor has blatantly disregarded this Court's directives as to the minimum requirements for the confirmation of the Plan.

19.     Western has testified that it is willing and able to pay the unsecured creditors in full as of the Effective Date.[23] The Debtor's original Plan proposed to pay the unsecured debt over a six-month period. The Plan now proposes to pay the unsecureds over three (3) months with no interest. Western filed a supplement to its Lift Stay Motion, pointing out that the Debtor's Plan artificially impairs the unsecured creditors and renders the Plan unconfirmable on those grounds.[24] As stated in the Supplement, the Fifth Circuit has recently reminded the courts that artificial impairment is improper. *See Bank of New York v. Official Unsecured Creditors Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 250-51 (5th Cir. 2010). Western incorporates its Supplement in full herein because the Debtor's class of unsecured claims remains artificially impaired under the Plan. Western respectfully requests that, for the grounds set forth below, the Court deny confirmation of the Plan and grant Western relief from the automatic stay.

## IV. <u>OBJECTION AND BASIS THEREFORE</u>

**A.      The Plan Illustrates Debtor's Blatant Disregard of this Court's Directives.**

20.     The Court directed the Debtor to propose a Plan with an adequate capital infusion, obtained without promising a return on that investment prior to satisfaction in full of Western's secured claim. Instead, the Debtor proposed an inadequate infusion of $1 million, to be obtained via subscription agreements contingent upon the entry of an order confirming the Plan as currently drafted and an annual return of $120,000. The Plan illustrates the Debtor's blatant disregard of this Court's directives.

---

[23] Transcript I: 41:7-17.

[24] *See* Supplement to Western Real Estate Equities, L.L.C.'s Motion for Relief from the Automatic Stay and Adequate Protection (docket no. 177) ("<u>Supplement</u>").

**1. The proposed capital infusion is woefully inadequate given that the Property is only 78% occupied.**

21.     The Debtor's promise of a $1 million infusion is, at best, the bare minimum cash commitment contemplated by the Court.  In fact, a $1 million "bump" is wholly insignificant given the secured debt of $33 million.  In addition, the Court made clear to the Debtor that it contemplated a cash infusion that would enable the Debtor to move the Property toward stabilization; however, the $1 million proposed by the Plan is simply not enough.

22.     According to Western's appraiser, Mr. Loughry, approximately $2.1 million would be required for the Debtor to achieve stabilization of the Property.  Even the Debtor's first appraiser projected that a $1.9 million cash infusion was required to stabilize the Property.  Mr. Pursley, the Debtor's second appraiser, did not project cash required to reach stabilization; however, he applied a 20% negative adjustment to comparable sales because the Property was not stabilized – he thus placed the "as stabilized" value $9.3 million higher than current value. Consequently, the Debtor's proposed $1 million infusion is several hundred thousand dollars, if not millions, short of the minimum amount of cash necessary to attempt stabilization.  Because the Plan contemplates paying Western interest only for the first 36 months of the plan, Western bears all of the risk of this lack of funding to reach stabilized occupancy.  Accordingly, the Debtor's "promise" of a potential $1 million equity infusion is woefully inadequate and does not support confirmation of the Plan.

**2. The inadequate capital infusion is contingent.**

23.     The Debtor's proposed capital contribution is nothing more than an unsubstantiated promise – the Debtor does not have cash in hand and will not have cash in hand at confirmation.  Nothing in the Plan evinces that the receipt of these funds is guaranteed. Indeed, the contributions are contingent.  As set forth in the Subscription Agreements, the new equity commits to contribute capital:

> in accordance with the Partnership Agreement, the Plan, and this Subscription Agreement, subject, however, to (i) confirmation of the Plan by the Court as

> currently drafted, (ii) entry of the Confirmation Order, (iii) occurrence of the
> Effective Date, and (iv) modification of the Partnership Agreement to include
> terms that are no less favorable to the Limited Partners than those set forth on
> Exhibit "A".[25]

The Debtor has not provided to Western any form of a new partnership agreement or the Exhibit

"A" referred to in the above-quoted provision of the subscription agreements.  Moreover, the

third contingency – the occurrence of the Effective Date – will not occur given that the Plan

conditions the Effective Date on receipt of the new equity funds.  The Effective Date is also

conditioned on the Plan Exhibits being executed and delivered; however, as articulated below,

the new documents are not in a form currently acceptable to Western.  Accordingly, based on

the plain terms of the subscription agreements, this Court could confirm the Plan on a phantom

promise of capital infusion that does not materialize.  Western doubts that the Court

contemplated these contingencies when it directed the Debtor to obtain a capital infusion to fund

the Plan.   As this Court knows, a promise of funding is not akin to cash in hand.  Thus, because

the promise of capital has not materialized, the Plan cannot be confirmed.

**3. The Debtor proposes a return to equity ahead of amortizing its secured debt.**

24.      The most egregious example of the Debtor's blatant disregard of this Court's

parameters is the Debtor's promise to give Preferred Equity a "12% annual return paid

quarterly".[26]  This Court made quite clear that any new equity could not receive any return on its

investment until Western's debt had been paid in full.  The Court directed that the Debtor be

clear in communicating this limitation to the proposed new equity investors.  Yet, despite this

precise mandate, the Debtor proposes to pay holders Preferred Equity a 12% quarterly return

while holding Western at interest-only for three more years, adding another 36 months to the

almost five (3)  that the Notes have been held in forbearance.  In short, the Plan proposes to

give equity a return that is more than two times (2x) the return to secured claims.  And, this 12%

---

[25] Subscription Agreement, p. 1, ¶ 1.

[26] Plan, p. 11 of 33, ¶ 1.51.

return is offered despite the fact that the Debtor's proposed equity infusion is barely above 3% of the total outstanding debt owed to Western.

25.     The Debtor blatantly disregarded both this Court's guidance and its explicit directions by proposing a woefully inadequate equity infusion and promising to pay the holders Preferred Equity a return while paying Western interest only for an additional three (3) years. Moreover, notwithstanding the Debtor's disregard of this Court's minimum requirements, nothing in the Plan can give the Court or Western confidence that the Debtor can use its cash to reach stabilization of the Property.   Consequently, the Plan cannot meet the legal requirements under section 1129 of the Bankruptcy Code.

**B.  The Plan Does Not Comply with Section 1129 of the Bankruptcy Code.**

26.     The Plan cannot be confirmed for several independent and distinct reasons: (1) the unsecured class is artificially impaired; (2) the Plan has not been proposed in good faith; (3) the Plan is not feasible; (4) the Plan does not propose fair and equitable treatment of Western's secured claim; (5) the Plan contains impermissible injunctions and releases for non-debtor third parties; (5) the Plan does not adequately provide for the payment of administrative claims; and (6) the Plan does not adequately provide for financial reporting to Western, and Western has not agreed to the form and substance of the New Western Note and attendant security documents.[27]   Consequently, the Plan cannot be confirmed under section 1129(a) or (b) of the Bankruptcy Code.

**1.     The Debtor's artificial impairment of Class 2 precludes a finding of good faith under section 1129(a)(3) and a validly-impaired accepting class of claims under section 1129(a)(10).**

27.     The Debtor is a single asset real estate debtor, with no employees, and admittedly filed this case to protect its equity holders.  There is no dispute that, at best, there is miniscule equity in the Property.  There is no hope that the Debtor will obtain a consensual plan

---

[27] Mr. French's testimony at the January 26, 2011 hearing confirmed that the Debtor is unable to amortize the Notes and could not make interest-only payments at a cramdown rate that Mr. French testified to be appropriate, 7.49%.  Transcript V: 136:10-13.

of reorganization, and the Debtor has not yet evinced the feasibility of its three-year, interest-only, forced-forbearance Plan. Thus, the Debtor's need for an accepting impaired class is evident.

28.    To obtain cramdown, the Debtor now "impairs" the unsecureds by proposing a no-interest three (3) month payout. Yet, the Debtor has less than $60,000 worth of unsecured claims and possesses the cash to pay them in full on the Effective Date. Indeed, with the additional $1 million equity infusion, the Debtor will have even more cash to satisfy in full all of the unsecured claims. It cannot be that the payment of less than 6% of the proposed $1 million equity infusion to the unsecureds on the Effective Date would cause the Debtor economic hardship. Indeed, the Debtor has admitted that it would not cause hardship to pay the unsecureds in full on the Effective Date. It further cannot be that there is any economic reason or any necessity related to plan implementation to stretch out payment to unsecureds past the Effective Date.

29.    The Plan provides for three (3) classes of creditors and interest holders as follows:

      a.    Class 1 is impaired and consists of Western's claim secured by the Debtor's sole asset, the Property;

      b.    Class 2 is impaired and consists of general unsecured creditors. The Plan, as presently written, assumes that Western will be fully secured and will have no deficiency claim to be included in Class 2; and

      c.    Class 3 is also impaired and consists of the various ownership interests in the Debtor.

30.    The Plan provides that Class 2 will be paid without interest within three (3) months after the Effective Date. Western, as the sole member of Class 1, is to be paid interest only over a three (3) year period. The equity owners, Class 3, retain their interests in the Debtor. They are classified, however, as impaired because their retained interests are subject

to dilution by the issuance of Preferred Equity under the Plan.  Old equity that does not fund its pro rata share of Preferred Equity is to be cancelled and forfeited as of the Effective Date.

### a. Section 1129(a)(10) requires an accepting, impaired class for cramdown.

31.    Section 1129(a)(10) requires that the Plan must be accepted by at least one impaired class of claims determined without including the acceptance of any insiders.  11 U.S.C. § 1129(a)(10); *see also Pacific Lumber Co.*, 584 F.3d at 250 ("An affirmative majority vote, in number and amount, of at least one class of 'impaired' claims was necessary to confirm a cramdown plan.").  The requirement contained in section 1129(a)(10) that the impaired accepting class be tallied without insider votes makes clear that section 1129(a)(10) cannot be, on its face, satisfied by the acceptance of an impaired class of interest owners.  *See, e.g., In re Texas Rangers Baseball Partners*, 434 B.R. 393, 410 (Bankr. N.D. Tex. 2010) (the existence of an impaired class of equity holders would not stand in for the lack of an impaired class of creditors if the debtor sought to invoke a cramdown); *In re South Beach Secs., Inc.*, 606 F.3d 366, 377 (7th Cir. 2010) ("The exclusion of insiders in deciding whether a plan has been accepted by impaired creditors is intended to prevent conflicts of interest . . . It brakes cramdowns by ensuring that some disinterested creditors have approved the plan.") (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243-44 (3d Cir. 2004) and *In re Windsor on the River Assocs., Ltd.*, 7 F.3d 127, 131 (8th Cir. 1993)).

32.    It is clear that the Debtor intends to use Class 2 as its accepting class to satisfy the requirements of section 1129(a)(10) in order to cram down the Plan over any rejecting vote by Western.  The Debtor's second amended Schedule F[28] and amended projections reflect the total amount of unsecured claims at $59,398.04.[29]  The undisputed evidence establishes that

---

[28] Docket no. 218.

[29] The Debtor's amended projections (docket no. 246-1) reflect that the Debtor will make three (3) payments of $19,799.00, which total $59,397.00.

Western's Allowed Secured Claim is at least $33 million.[30]  Consequently, it is undisputed that the Class 2 unsecured creditors' claims constitute only two-tenths of one percent (0.2%) of the creditor body.  The other 99.8% consists of Western's Class 1 claim.

### b. The Debtor has no economic reason or valid business justification for the impairment of the unsecured class of claims.

33.     The testimony of Bo Brownlee, principal of the Debtor, confirms that there is no valid justification for impairment.  At the first hearing on the Lift Stay Motion, held November 22, 2010, Mr. Brownlee was called to the stand as an adverse witness.  Mr. Brownlee was questioned about the reason for the Debtor's bankruptcy filing.  He testified that the sole reason for filing was to protect ownership from a foreclosure.  The transcript of the portion of Mr. Brownlee's testimony on this issue includes the following excerpts:

> Q.  Would you agree that the reason for filing the bankruptcy was "to protect ownership from foreclosure"?  Is that correct?
>
> A.   Yes, sir.
>
> Q.  Okay.  And that was the only reason to file the bankruptcy?
>
> A.  Yes, sir.
>
> Q.  I mean, it was to protect you guys and your limited partners from foreclosure and losing their investment, wasn't it?
>
> A.  Yes, sir.
>
> Q.  It wasn't to protect the unsecureds, was it?
>
> A.  Well, as I've learned through the bankruptcy proceedings, apparently, we should have not paid more people. Unfortunately, we were current on most of our bills.  So I'm not – no, it wasn't to protect to unsecured creditors, because most of them had been paid.
>
> Q.  Okay.  And in fact, on the date you filed, you had enough money to pay the unsecured creditors in your account, didn't you?
>
> A.  Yes, sir.[31]

---

[30] *See* 506(b) Motion.

***c.  Paying the unsecureds in full on the Effective Date does not jeopardize the Debtor's cash available for operations.***

34.      At the continuation of the Lift Stay Hearings on January 26, 2011, Mr. Brownlee was questioned extensively regarding the Debtor's ability to pay the approximately $60,000 in unsecured claims on the Effective Date.  He unequivocally testified that the Debtor had the ability to pay these claims in full on the Effective Date, and that such payment would in no way hinder or jeopardize the Debtor's reorganization effort.  Mr. Brownlee directly admitted that there was no economic basis to impair Class 2 by extending the term of payment as opposed to simply paying them on the Effective Date.  In sum, he admitted that the impairment of Class 2 was artificial and not required to effectuate the reorganization.

35.      The transcript of the portion of Mr. Brownlee's testimony on this issue includes the following excerpts:[32]

a.      Mr. Brownlee testified that although the Debtor didn't need it (80:8), he expected a cash infusion of $600,000 from the Debtor's owners which he was confident will be received by the Effective Date. (78:15-22);

b.      The Debtor's then-current cash in its operating account, not including the tax escrow and tenant security deposits, at the end of December 2010 was $690,000 (81:22);

c.      The cash collateral budget for February 2011 (Western's Exhibit 96), which Mr. Brownlee believed to be accurate (83:9-12), projected an ending cash balance of $735,000 in operating cash, exclusive of tax and tenant escrow (83:5, 83:24-84:15);

d.      The original plan projections included in the Debtor's original disclosure statement (Western's Ex. 71; Debtor's Exhibit A-01) projected $767,000 in operating cash as of March 1, 2011 (85:21-25);

---

[31] Transcript I: 92:10-93:3.

[32] Each of these excerpts is from Transcript V, January 26, 2011.

e. Consequently, the projected operating cash of $735,000, plus the $600,000 from the Debtor's equity partners, left approximately $1,367,000 in operating cash available to the Debtor upon the Effective Date (86:1-8);

f. Based on the Debtor's schedules, the total of the unsecured debt is less than $60,000 (87:1-6). Debtor used this amount in its original plan projections (87:6-13);

g. The sum to be paid to the unsecured creditors amounts to only about 4% of the $1,367,000 available to the Debtor as of the Effective Date (87:17-88:2);

h. Based upon this, Mr. Brownlee admitted that the Debtor could pay unsecured creditors on the Effective Date:

> Q. Okay. So would you agree that on the effective date of the plan, you would have enough cash for the Debtor to pay off the $60,000 owed to unsecured creditors in cash at that time?
>
> A. That's what it appears to be, yes sir.
>
> Q. So it would not be a hardship upon the Debtor to make the $60,000 cash payment to the creditors on the effective date of the plan, would it?
>
> A. I think that there's a whole lot of assumptions on our submission that haven't been agreed to, but based on your assumptions, it doesn't appear to be a hardship….
>
> * * *
>
> THE COURT: Under the projections, you could pay the $60,000, correct?
>
> THE WITNESS: Yes, sir.

i. Mr. Brownlee then admitted that there was no economic reason not to pay the unsecured creditors upon the Effective Date:

> Q. In an economic context, it doesn't cause any hardship in the reorganization to pay unsecured creditors on the effective date, does it?
>
> A. It doesn't appear to.

Q. In fact, you would still have $1.3 million in cash left, would you not?

A. I trust that you've done the math.

Q. Well, if you're going to be at $1,367,000 and you pay the $60,000, that leaves about $1.3 million left.

A. Yes sir.

36. Since Mr. Brownlee's January 26, 2011 testimony, the only economic changes to the Plan and Disclosure Statement are as follows: (i) the Debtor projects net operating cash of $754,289 (approximately $20,000 more than projected in the last set of projections); (ii) the Debtor proposes to pay its holders of Preferred Equity $30,000 in the same month that it makes the final payment of $19,799 to unsecureds; and (iii) the Debtor projects to have $741,283 as an ending cash balance in September 2011. These numbers illustrate that the impairment of the unsecured class of claims is not based on economic factors, but rather, the Debtor's need for an accepting impaired class.

### d. Case law does not support artificial impairment without a corresponding valid business justification.

37. The leading case on artificial impairment is *Windsor on the River Assocs. v. Balcor Real Estate Fin.* (*In re Windsor on the River Assocs.*), 7 F.3d 127 (8th Cir. 1993). The facts in *Windsor* are almost identical to the current case. There the debtor was a single asset real estate entity which owned a 298-unit apartment complex in Cedar Rapids, Iowa. The complex was subject to a lien in favor of Balcor in the amount of $9,879,227.81. The debtor's plan purported to impair Class 2 and Class 3. Class 2 consisted of one claim in the amount of $59,249. Class 3 consisted of a number of small unsecured trade creditors whose claims totaled approximately $13,000. These two (2) classes were to be paid in full sixty (60) days after the plan's effective date. In addition, similar to this case, the debtor's partners were going to make a $1 million capital contribution, of which $435,000 would be used to pay down Balcor's note. The district court confirmed the plan over Balcor's objection concluding that the $13,000

in Class 3 unsecured trade debt constituted an accepting class as required by section 1129(a)(10), thereby allowing the debtor to seek cram down of the plan as against Balcor.

38.     Reversing the district court, the Eighth Circuit framed the central issue presented by the appeal as whether the impairment of Class 3 was "manufactured at the will of the debtor" so that payment to these creditors could not be used to satisfy the requirement of section 1129(a)(10) of acceptance by at least one impaired class of creditors.  The court began by reviewing the history behind section 1129(a)(10), and the changes from the prior Bankruptcy Act, concluding that "[c]onfirmation of a plan where the debtor engineers the impairment of the only approving impaired class 'so distorts the meaning and purpose of [section 1129(a)(10)] that to permit it would reduce (a)(10) to a nullity.'"  *Id.* at 131.  Consequently, the court of appeals concluded that if the impairment of the class was manufactured, the purpose of the statute was circumvented, and that the allegedly impaired Class 2 and Class 3 creditors could not be used as accepting impaired classes to support cramdown.  *Id.* at 132.

39.     The court of appeals then concluded that the impairment of both Class 2 and 3 was manufactured:

> The face of Debtor's third amended plan of reorganization clearly shows that the unsecured trade creditors' claims of Class 3 and the disallowed Class 2 claim were arbitrarily and artificially impaired. Simple remanipulation of the plan demonstrates this. Had Debtor's plan allowed for a smaller payment to Balcor, say, $400,000 instead of $500,000, Debtor could have paid both the Class 2 and Class 3 claimants on the effective date…. The only purpose to be served by the delay in payment to the Class 2 and Class 3 claimants was, therefore, to ensure approval by at least one "impaired" class as required by section 1129(a)(10). Debtor never presented a plausible alternative explanation.

*Id*. at 132-33.  Concluding that no plan could be proposed which the only impaired creditor, Balcor, would approve, the court concluded that remand for further proceedings would be futile. Accordingly, the case was reversed and dismissed.  *Id*. at 133.

40.     The court in *In re Investors Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760 (Bankr. N.D. Fla. 1994) followed *Windsor* based upon facts also very similar to those in this

case.  In *Investors*, like *Windsor*, the debtor's principal asset was an apartment project.  FBM held a first lien on the property to secure a claim in the approximate amount of $6.2 million.  Class 5 under the debtor's plan consisted of $16,000 in unsecured claims which were to be paid in full over their guaranties after the effective date.  FBM's claim was included in class 4.  FBM voted to reject the plan and the debtor sought cram down based upon the acceptance of the class 5 unsecured creditors.  Citing *Windsor*, the bankruptcy court found the impairment of class 5 to be artificial as the debtor had more than sufficient cash to pay such claims on the effective date.  The court concluded the claims were artificially impaired as there was "no credible reason to believe that payment in full of these claims on the effective date of the plan will in any way unduly burden the Debtor or threaten the feasibility of the plan."  168 B.R. at 767.  Consequently, the *Investors* court held that because the class 5 creditors were artificially impaired, the plan must be treated as if no impairment existed.  Concluding that confirmation of a plan was impossible without the support of FDM, the case was dismissed.  *Id.*

41.  The Debtor bears the burden of establishing compliance with section 1129(a).  *In re W.C. Peeler Co., Inc.*, 182 B.R. 435, 437 (Bankr. S.C. 1995).  In order for a class of claims to be considered impaired so as to satisfy section 1129(a)(10) and allow cram down as against another creditor, "it is incumbent upon the debtor to show to the satisfaction of the court that it is necessary to impair the accepting class for economical or other justifiable reasons.  In other words, the debtor must prove that impairment of the particular class is needed to achieve reorganization, not just to trigger 'cramdown.'"  *Id.* at 437.  Consequently, to use an impaired class to satisfy section 1129(a)(10), the impairment must have some reasonable basis other than to create the required impaired accepting class.  *In re Daly*, 167 B.R. 734, 736-7 (Bankr. D. Mass. 1994).

42.  Other authorities are in accord that a class may not be artificially impaired to satisfy section 1129(a)(10).  Instead, the Debtor must make some showing that the proposed impairment is necessary for economic or other justifiable financial reasons in order to proceed to

cram down.  *In re Fur Creations by Varricle*, 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995); *In re Dunes Hotel Assoc.*, 188 B.R. 174, 184-89 (Bankr. D.S.C. 1995); *In re Gregory Rockhouse Ranch*, 2007 Bankr. LEXIS 4343 at *11-12 (Bankr. D. N.M. Dec. 21, 2007) (after a review of conflicting authorities, court concluded that "artificial impairment is not permissible under 11 U.S.C. §1129(a)(10)"); *In re Dean*, 166 B.R. 949, 954 (Bankr. D.N.M. 1994).

> **e.  *Artificial impairment may indicate a lack of good faith.***

43.      Some authorities have viewed the debtor's creation of an artificially impaired class as a species of lack of good faith under § 1129(a)(3) rather than as a debtor's failure to meet its burden under section 1129(a)(10).  *See, e.g., In re Quigley Co.*, 437 B.R. 102, 126, n. 31 (Bankr. S.D.N.Y. 2010) (citing cases) (court did not address section 1129(a)(10) because it found that the "voting manipulation that occurred in this case constituted bad faith under § 1129(a)(3)").  Analyzing artificial impairment under section 1129(a)(3) does not, however, reduce the straightforward requirement under section 1129(a)(10) that one impaired class accept the plan, particularly in light of the Fifth Circuit's *Greystone* and *Sandy Ridge* opinions (discussed below), which support the categorical rejection of artificial impairment via section 1129(a)(10) of the Code.  *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1280-81 (5th Cir. 1991) (gerrymandered classification scheme could not provide accepting impaired class under section 1129(a)(10)); *Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1353 (5th Cir. 1989) (remanding to bankruptcy court whether the debtor's classification of the tax claims and unsecured claim as impaired violated the requirement of good faith and the requirement that one class of impaired claims accept the plan pursuant to section 1129(a)(10)).

> **f.  *Recent decisions from this Court require that impairment be more than de minimus and based on reasonable business justification.***

44.      Oddly, the Eighth Circuit's *Windsor* decision had not been cited by a court located in the Fifth Circuit prior to Judge Nelms' recent decision in *In re Texas Grand Prairie*

*Hotel Realty, LLC*, Case No 10-43242.  In *Texas Grand Prairie*, the lender objected to certain

classifications and treatments in the debtor's plan, arguing *inter alia* that one of the classes of

claims was artificially impaired to obtain an accepting impaired class for cramdown of the

lender's claim.  Ultimately, Judge Nelms confirmed the plan over this objection; however, the

reasons undergirding that decision cannot be relied upon by the Debtor in this case.[33]

45.     To begin, Judge Nelms stated that the Fifth Circuit's opinion in *Bank of New York

v. Official Unsecured Creditors Committee (In re Pacific Lumber Co.)*, 584 F.3d 229, 250-51 (5th

Cir. 2010), "leads the Court to believe that the Fifth Circuit would require that impairments be

more than *de minimus* and have some reasonable business justification, which is the standard

in many jurisdictions."[34]  Citing to *Windsor*, Judge Nelms further stated:

> there must be some type of economic justification for the impairment.  If the
> debtor's motivation in impairing a class is solely to obtain plan approval by at
> least one impaired class, and the impairment is without legitimate business
> purpose, the acceptance cannot be used to meet section 1129(a)(10).[35]

46.     As illustrated by Mr. Brownlee's testimony, in the case *sub judice*, there is no

legitimate business reason to delay payment to the unsecureds.  Further, delay of three (3)

months in full payment is likely *de minimus*.  While Judge Nelms found that a six (6)-month

delay in payment of $350,000 was a meaningful impairment*,* here, the three (3)-month delay in

payment of $60,000 worth of unsecured claims here is not justified when the Court considers

that at the time the Debtor filed its original plan of reorganization, the Debtor knew that it would

still have $1.3 million in cash on hand even if it paid the unsecureds in full on the Effective Date.

---

[33] Judge Nelms cited to three cases as supporting the proposition that a "debtor does not artificially impair a class by delaying payments to certain creditors so that it can retain sufficient cash for continued operations."  Transcript of proceedings before Judge Nelms, April 28, 2011, Ruling on Modified Chapter 11 Plan: 9:20-23.  These cases: *In re Carolina Tobacco Co.*, No. 05-34156, 2006 U.S. Dist. LEXIS 6577 (D. Or. Feb. 1, 2006); *In re Memorial Prods. Co., Inc.*, 212 B.R. 178 (B.A.P. 1st Cir. 1977) and *In re Greenwood Point, LP, No. 10-00569*, 2011 Bankr. LEXIS 392 (Bankr. S.D. Ind. Feb. 4, 2011) support that proposition; however, as explained in the body of this Objection, the Debtor herein does not need to delay payments to Class 2 creditors in order to retain sufficient cash for continued operations.

[34] Transcript of proceedings before Judge Nelms, April 28, 2011, Ruling on Modified Chapter 11 Plan, p. 7.

[35] *Id.*

This fact alone renders this impairment case markedly different from that in *Texas Grand Prairie*. In that case, the debtor faced a lender that demanded that all excess cash be turned over at confirmation. There, if the debtor did not impair the unsecureds, it would have had approximately $43,000 in cash after confirmation of its plan – here, in contrast, at the time the Debtor proposed the impairment, over a million dollars would remain even after payment in full of the $60,000 worth of unsecured claims. And, now, the Debtor's own projections reveal that the Debtor can make the first dividend payment to holders of Preferred Equity and the third and final payment to the unsecured creditors without jeopardizing its cash reserve or ongoing operations. Furthermore, in *Texas Grand Prairie*, impaired creditors other than the allegedly artificially impaired class accepted impaired treatment. Here, other than Western, the unsecured class is the only impaired class creditors.

47. Thus, unlike the circumstances presented to Judge Nelms in *Texas Grand Prairie*, this Debtor need not delay payment to the unsecureds in order to retain sufficient cash for continued operations. Consequently, the Debtor has offered no valid business justification to support the *de minimus* impairment of the unsecured class of claims. In essence, the Debtor is gerrymandering.

### g. In the Fifth Circuit, Thou Shalt Not Gerrymander.

48. The Fifth Circuit has rather famously stated "thou shalt not" gerrymander to obtain an accepting impaired class of claims. *In re Greystone III Joint Venture*, 995 F.2d at 1279; *see also In re Idearc, Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex. 2009) ("Classification of substantially similar claims in different classes is permitted for purposes of reorganization only and for reasons independent of debtor's motivation to secure the vote of an impaired, assenting class of claims"); *In re Northwest Timberline Enters.*, 348 B.R. 412, 440, n.3 (Bankr. N.D. Tex. 2006) (noting that *Greystone* included as a reason for its "thou shalt not gerrymander" holding that the integrity of the bankruptcy process cannot allow for a debtor's manipulation of acceptance by artful classification, or to "finagle an impaired, accepting class of claims"). Since

the concepts of gerrymandering and artificial impairment to produce an impaired accepting class of creditors are closely related, the policies underlying this rule should be equally applicable as to artificial impairment of a class of creditors to satisfy section 1129(a)(10). *See In re Windsor on the River Assocs., Ltd.*, 7 F.3d at 131 (referring to the issues of artificial impairment and artificial classification as being "closely related"); *In re W.C. Peeler Co., Inc.*, 182 B.R. at 437-38 (citing to *In re Bryson Props.,* 961 F.2d 496 (4th Cir. 1992) and reasoning that Fourth Circuit would concur with Eighth Circuit's *Windsor* decision; *Peeler* court dismissed case after finding that debtor failed to meet its burden under 1129(a) that the impaired accepting class [small unsecured claim paid out over six months] was a "truly impaired creditor whose acceptance can consign the other creditors to a cramdown"). The underlying policy justification for preventing a debtor from manipulating the vote is stated by the *Peeler* court as follows:

> In order for a claim to be considered "impaired" under 1129(a)(10) so as to cause "cramdown" of another creditor's claim, it is incumbent upon the debtor to show to the satisfaction of the court that it is necessary to impair the accepting class for economical or other justifiable reasons. In other words, the debtor must prove that the impairment of the particular claim is needed for it to realize and achieve reorganization not just to trigger "cramdown." Without this showing, a debtor could manipulate the bankruptcy code to engineer an artificially impaired claim and this constitutes bad faith.[36]

49.     Prior to *Greystone*, the Fifth Circuit directly condemned artificial impairment to satisfy section 1129(a)(10) in *In re Sandy Ridge Dev. Corp.*, 881 F.2d at 1353. There the appellate court expressed doubts regarding the debtor's good faith based upon "impairing" class 2 tax claimants ($10,000) and the single class 5 unsecured claim ($2,500). This was condemned as inappropriate because there was no reason to impair these classes other than to satisfy section 1129(a)(10). The Fifth Circuit recently has reminded the courts that artificial impairment remains improper, *see In re Pacific Lumber Co.*, 584 F.3d at 250-51, although the issue on appeal had become moot.

---

[36] 182 B.R. at 437.

50.     This Court, however, appears to have adopted the rationale underlying the

reasoning and policy of the *Windsor* decision based on a recent pronouncement in *In re Texas*

*Rangers Baseball Partners*, 434 B.R. 393, 410 (Bankr. N.D. Tex. 2010):

> Given the impasse reached between the BOC and the Lenders, that would mean
> Debtor would have to artificially impair some class of creditors so that it satisfies
> the requirement for invocation of section 1129(b)(1) of the Code that one
> impaired class of creditors has accepted the proposed plan (Code §
> 1129(a)(10)). It would be inconsistent with public policy to construe the Code in a
> manner that encourages debtors to deal with creditors by artificial impairment
> when such creditors could otherwise be left unimpaired.[36]
>
> [36] It is obviously preferable that a debtor's reorganization involve only that
> impairment of claims and interests which is actually needed to effect the debtor's
> reorganization and ensure against the need for future bankruptcy proceedings.

51.     Based on the undisputed testimony of the Debtor's principal, deferring the

payment of $60,000 in unsecured debt is not even arguably required in order to effect the

proposed reorganization or to insure against the need for future bankruptcy proceedings.

Instead, the brief delay in the payment of the Class 2 creditors is clearly and transparently for

the purpose of creating an impaired accepting class of creditors.

52.     In order to seek to cram down the Plan over a rejecting vote of Western, the

Debtor must obtain acceptance by Class 2 as an impaired class of creditors in order to satisfy

section 1129(a)(10).  However, an ample supply of case law mandates that, whether under

section 1129(a)(3) or (a)(10), a debtor may not use an artificially impaired class to cram down

the creditor or creditors holding the vast majority of the claims in the case.  Here, this Debtor

seeks to cram down the Plan on the 99.8% of the claims held by Western by artificially impairing

the remaining two-tenths of 1% of claims classified in Class 2.  As testified to by Western's

principal, John Sledge, Western is willing and able to pay the artificially impaired class of

unsecured claims in full on the Effective Date.

53.     Thus, in stark contrast to the facts before Judge Nelms in *Texas Grand Prairie*,

there is no valid business justification for impairing Class 2; therefore, that class is artificially

impaired.  And, as raised by the Eighth Circuit in *Windsor* and articulated by Judge Nelms, if a

debtor is allowed to confirm a plan with a manipulated impaired class, the debtor is in effect using bankruptcy as an alternative to refinancing because it does not have the ability to refinance in the open market and cannot obtain consensual terms from its lender. These circumstances, as present in this attempted cramdown confirmation, do not comport with the purpose and policy of sections 1129(a)(10) and (a)(3) of the Bankruptcy Code.

**2. The Debtor's Plan has not been proposed in good faith.**

54.     Section 1129(a)(3) of the Bankruptcy Code requires that the Plan be "proposed in good faith and not by any means forbidden by law."[37] The Court is in the best position to assess the Debtor's good faith, *see Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Co.)*, 150 F.3d 503, 519 (5th Cir. 1998), and the good faith analysis is done in light of the totality of the circumstances and the purposes of the Bankruptcy Code, *see id.* The Fifth Circuit has held that the Plan must be proposed with the legitimate and honest purpose to reorganize and have a reasonable hope of success. *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). The good faith analysis also requires the Court to independently determine if the Plan fairly achieves a result consistent with the Bankruptcy Code. *See, e.g., In re Block Shim Dev. Company-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).

55.     Like the other requirements for confirmation, section 1129(a)(3) requires that the Debtor meet it by a preponderance of the evidence. *In re Gen. Electrodynamics Corp.*, 368 B.R. 543, 551 (Bankr. N.D. Tex. 2007). In this case, as set forth above, the artificial impairment of Class 2 negates a finding of good faith. Similarly, as set forth below, the proposed injunction against Western's pursuit of the Guarantors, all non-debtor third parties, is also evidence of the Debtor's lack of good faith in proposing this Plan. This case is about protecting the equity alone, as evinced by the quarterly return to Preferred Equity at the expense of amortizing the Western debt. As such, the preponderance of the evidence cannot support a positive finding for the Debtor under section 1129(a)(3).

---

[37] 11 U.S.C. § 1129(a)(3).

### 3. The Plan is not feasible.

56.     The feasibility test of section 1129 requires this Court find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[38]  The Debtor must satisfy the Court, by a preponderance of the evidence, that "carrying out the terms of the plan, in the context of future operations, is not likely to force the debtor into liquidation or further reorganization proceedings." *In re Gen. Electrodynamics Corp.*, 368 B.R. at 551.  The certainty required does not equate, however, "to giving the Debtor the benefit of every doubt nor does it shift to [Western] the burden to show that the Plan is *not* feasible."  *Id.* (emphasis in original) (citing *In re Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1991)).  A plan "must present a reasonable assurance of success . . . may not be speculative or be based on unreasonable assumptions."  *Cantu v. Gonzalez (In re Cantu)*, 398 Fed. Appx. 76, *4 (5th Cir. 2010) (unpub.) (citations omitted).  In short, "confirmation is granted only if the evidence reflects a reasonable expectation that the payments required to be made during the term of the plan will be made."  *In re Save Our Springs Alliance, Inc.*, No. A-08-ca-727, 2009 U.S. Dist. LEXIS 121177, *8 (W.D. Tex. Sept. 29, 2009), *aff'd*, 2011 U.S. App. LEXIS 1607 (5th Cir. Jan. 26, 2011).

57.     At the Lift Stay Hearings, the Debtor has admitted that it has "no specific plans" to increase occupancy.[39]   Yet, the feasibility of the Plan depends on stabilizing the Property. Indeed, the Debtor has offered no evidence to support the Plan's feasibility, which requires the Property to stabilize in a year and half, other than "to work hard and try to work with the brokerage community."[40]  And, as noted above, the infusion of $1 million is far below the

---

[38] 11 U.S.C. §1129(a)(11).

[39] Transcript V: 94:7-21.

[40] Transcript V: 94:18-21.

amount all the appraisers deemed necessary to achieve that end.  Consequently, there is not any credible evidence, let alone a preponderance, that the Plan is feasible.

58.     In addition, Western's expert, Paul French, explained that using the interest rates testified to by Mr. Brownlee as available in the marketplace for a loan on the Property, the appropriate cramdown rate was 7.49%.[41]  While this was not Mr. French's final opinion on the appropriate cramdown rate, his analysis at that time was that the Debtor's then-plan was not feasible at an appropriate cramdown rate.  Additionally, Mr. French's analysis of the Debtor's budgets and variance reports (from August 2010 to February 2011), along with the underfunded escrow for the unpaid 2nd half of the 2010 real estate taxes, led him to conclude that the Debtor would run short of the $156,754 required monthly payment, even with the 5.83% interest-only proposal.  Since that testimony, the Debtor's monthly operating cash has increased; however, the Debtor has signed one new lease <u>total</u> since the Petition Date.  Accordingly, any cash buildup is solely a result of the lack of leasing activity on the Property and the Debtor's failure to make debt service for six (6) months prior to commencing interest only payments in November of 2010.

59.     Despite these realities, the Debtor's current projections contain a magical stabilization process, one that begins to generate additional cash in month 17 of the Plan. Month 16, however, reveals that the Debtor will have a then-cash balance of $263,989.  But, because the Debtor's projections neither include the section 506(b) amounts owed to Western nor the accurate amount of the Debtor's professionals' fees, it is likely that, based on actual numbers, the Debtor will not be marching toward stabilization and will run out of money in the first year of the Plan.  At that time, the Debtor will face the same dismal, and more accurately, non-existent, refinancing prospects it faces today.  Coupled with the Debtor's recent lease proposal, which required a $250,000 tenant improvement allowance, it is evidence that the $1

---

[41] Transcript V: 122:3-124:2.  *See also* Western's Exhibit 90.  As Mr. French testified, if the actual loan to value ratio was 70% rather than 75%, the cramdown rate would become 8.28%.  Transcript V: 127:16-21. *See also* Western's Exhibit 99.

million capital infusion will not support the necessary growth.  Consequently, the Debtor's Plan

virtually points to exactly when the Debtor will face a further reorganization of its debt load.  The

projection's ending cash balance in month 36 is supported by no historical precedent, no

evidence of leasing activity on the Property, and not enough capital to stabilize the Property.

The Debtor does not have the ability to show feasibility of its Plan by a preponderance of the

evidence.

### 4.  The Plan does not provide for the full payment of administrative claims required by section 1129(a)(9).

60.     Section 1129 requires the Debtor's Plan to provide for cash payments on the

Effective Date equal to the allowed amount of administrative claims unless administrative

claimants agree to different treatment under the Plan.[42]  The Debtor's projections estimate the

Debtor's professional fees to be approximately $185,000 net of retainers; however, based on

Western's professionals' fees, this number cannot be accurate.  Likely, the Debtor has incurred

more than $200,000 in administrative expenses, yet the Plan fails to provide for cash payment

on the Effective Date or different treatment agreed to by such claimants.  As set forth in the prior

section, the Plan is not feasible, and Western believes that once the accurate amount of

administrative claims is included in the Debtor's projections, the feasibility of the Plan will

worsen, not improve.

### 5.     The proposed treatment of Western's claim is not fair and equitable.

61.     The Plan cannot be confirmed over Western's objection unless the requirements

of section 1129(b) are met with respect to the treatment of Western's secured claim.  Among

those requirements is that the Plan be "fair and equitable" with respect to the treatment of

Western's claim.[43]  Section 1129(b)(2)(A) sets forth minimum requirements that must be met

before treatment of a secured claim may be characterized as fair and equitable.  These

---

[42] 11 U.S.C. § 1129(a)(9)(A); § 507(a)(2).

[43] 11 U.S.C. § 1129(b)(1).

minimum requirements are a baseline, however, and mere "technical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is 'fair and equitable.'"[44]  Rather, "[a] court must consider the entire plan in the context of the rights of creditors under state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable.'"[45]  For the reasons set forth below, the Plan is neither fair nor equitable in its treatment of Western's secured claim.

> ### a. *The Debtor possesses little or no equity in the Property and the Plan is designed to benefit only the Debtor's equity interest holders.*

62.     Fair and equitable treatment of creditors is neither the goal nor the effect of the Debtor's Plan.  With respect to the Class 2 general unsecured creditors, the Plan leaves such creditors worse off than they will be if the stay is lifted to allow Western to foreclose on the Property.  If the automatic stay is lifted, Western will pay the unsecured claims in full immediately.  Under the Plan, such creditors must wait to be paid – without interest – for three months post-confirmation.  The Debtor can offer no business justification for the delay in payment of unsecured claims and the lack of payment of interest on such claims.[46]  The proposed treatment of unsecured claims is unjustified artificial impairment, the sole object of which is to obtain the required consenting class of impaired claims to allow for cramdown

---

[44] *Fed. Sav. & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Constr., Inc.)*, 865 F.2d 673, 675 (5th Cir. 1989) (citing 5 COLLIER ON BANKRUPTCY ¶ 1129.03 at 1129-52 (15th ed. 1988)); *accord Sandy Ridge*, 881 F.2d at 1352 ("[Section 1129(b)(2)] merely sets minimal standards that a plan must meet, and does not require that 'every plan not prohibited be approved.'") (quoting *In re D & F Contr.*, 865 F.2d at 675).

[45] *In re D & F Constr.*, 865 F.2d at 675.

[46] The total unsecured debt equates to approximately 6% of the $1 million in Preferred Equity the Debtor claims will be contributed under the Plan.  Any claim by the Debtor that it would be unfeasible to devote $60,000 of the Preferred Equity to full payment of unsecured claims on the effective date would be frivolous.  While the Plan is unfeasible under any circumstances, payment of $60,000 on the Effective Date would not materially change the Debtor's prospects for reorganization one way or the other.  Indeed, it stands to reason that if the Debtor has been able to convince existing equity (or new investors) to throw $1 million of good money after bad, the Debtor surely has the ability to raise $60,000 to provide unsecured creditors with an optimal return on their claims (i.e., payment in full on the Effective Date).

confirmation over Western's objection. Consequently, the Debtor cannot possibly demonstrate that the Plan is designed to protect the interests of unsecured creditors.

63.     Nor can the Debtor begin to demonstrate that the aim of the Plan is to protect the interests of Western. If the Debtor possesses any equity in the Property at all, that equity is negligible. The Plan does nothing to protect whatever razor-thin equity cushion Western "enjoys" in the Property. Rather, the Plan requires Western, for three (3) years, to bear the entire risk of any decrease in the value of the Property while the Debtor unrealistically hopes for a drastic turnaround in the real estate market and unprecedented improvements in its own operations. During this three year period when the Debtor proposes to gamble with Western's collateral, the Debtor proposes to pay a 12% annual return on the Preferred Equity, which would total $360,000. There is nothing fair or equitable about a plan that, after a seven (7) year interest-only period borne by the Noteholder, proposes another three (3) year interest-only period while the Debtor pays equity a twelve percent (12%) return.

64.     Western understands that the Preferred Equity would be contributed by the Debtor's existing equity interest owners (with the exception of one limited partnership interest owner that may have declined to contribute to the Preferred Equity). Thus, the Plan envisions that the Debtor's current equity owners will own the equity in the reorganized Debtor. In light of this and the proposed treatment of unsecured claims and Western's claim, there can be no argument over who the Plan is designed to benefit. The sole beneficiaries of the Plan are the Debtor's existing equity. There is nothing fair or equitable about unnecessarily delaying payment to unsecured creditors and shifting the entire risk of loss of value in the Property to Western for three (3) years solely to protect the Debtor's current equity owners.

**b.      The Plan fails to amortize the debt to Western for three years and inappropriately shifts the entire risk of loss of property value to Western during that period**.

65.     The Debtor has admitted that, over the course of seven (7) years, it has failed to pay one penny of principal on the debt held by Western.  Under the Plan, the Debtor seeks to stretch this number to ten by continuing to tread water for another three (3) years while paying interest only to Western.  While the Debtor does not propose a negative amortization plan, the non-amortizing New Western Note should be scrutinized as strictly as would a negatively amortizing one.  A negative amortization note does not *per se* fail the fair and equitable test under section 1129(b) of the Bankruptcy Code.[47]  As to a secured creditor, however, when no amortization is coupled with pure speculation that the market (or as here, the market and occupancy) will substantially improve, such plan treatment is not fair and equitable because the secured creditor is, in effect, forced to make a post-confirmation loan and assume a worse financial position than it had prior to confirmation.[48]

66.     The Notes held by Western had been in forbearance for approximately four and a half years as of the Petition Date.  Under the Plan, the Debtor is proposing another three years of forced forbearance.  During these three years, the entire risk of depreciation of the Property is unfairly shifted to Western.  Even a relatively small depreciation in the value of the Property post-confirmation would likely wipe out any equity cushion protecting Western, if such an equity cushion exists at all.

67.     Throughout the prepetition years during which the Western debt was in forbearance, the Debtor could not amortize or refinance the debt and failed to materially improve the performance of its business operations.  The Debtor proposes to emerge from chapter 11 with the same prepetition management structure intact.  The Debtor cannot provide any competent evidence that would lend credence to the idea that the Debtor will somehow be able to sell or refinance the Property post-confirmation, or improve the performance of its

---

[47] *In re D & F Constr.*, 865 F.2d at 676; *see also In re Gen. Electrodynamics Corp.*, 368 B.R. at 550 (citing cases regarding the disfavored status of negative amortization).

[48] *See In re D & F Constr.*, 865 F.2d at 676.

business to the level needed to pay anything other than interest on the Western debt. The Debtor's Plan is built on nothing more than mere speculation that the real estate market, occupancy rates at the Property and profitability of the Debtor's operations will all dramatically improve in the span of 36 months. During this three-year period, the Plan fails to protect Western's interest in the Property, but instead allows the Debtor to gamble with Western's collateral. The complete shift of risk of loss of value in the Property to Western for three years post-confirmation is patently unfair and inequitable and renders the Plan unconfirmable.

        *c.*      ***The treatment of Western's claim is unfair and inequitable in light of the return to be paid on Preferred Equity.***

68.      Under the Plan, the Debtor proposes to make quarterly payments to holders of Preferred Equity at the rate of 12% per annum. Even if this proposal did not violate the Court's directive that no return be paid on new equity investments until Western is paid in full, the proposal still renders the proposed treatment of Western's claim unfair and inequitable.

69.      The Debtor is seeking another three-year extension of forbearance on the Western debt, during which the Debtor proposes to pay nothing more than interest at a below-market rate equal to less than half the rate of return it proposes to pay to Preferred Equity. While not one penny of the principal of Western's debt would be paid during this period, the holders of Preferred Equity would receive interest payments totaling $360,000 on their $1 million investment. Under no interpretation of the Bankruptcy Code's requirement of "fair and equitable" treatment of a crammed down secured claim – no matter how strained or tortured – can the Debtor's proposed treatment of Western's claim be found fair and equitable in light of the return the Debtor proposes to pay on Preferred Equity. There is nothing fair or equitable about holders of Preferred Equity receiving substantial returns on their investment for three years while Western receives interest only payments at a below-market rate and bears the entire risk of depreciation of the Property.

**d.    The proposed interest rate to be paid to Western renders the treatment of Western's claim unfair and inequitable.**

70.    If a plan of reorganization is to be crammed down on a dissenting secured creditor and the plan provides for deferred payments on that creditor's claim, the creditor must receive "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property."[49]  This requirement mandates that a secured creditor receive interest payments at a market rate consisting of a risk-free rate plus an upward adjustment to take into account the appropriate degree of risk of nonpayment.[50]

71.    The risk adjustment premium required under *Till* includes an analysis of (i) the circumstances of the Debtor's estate, (ii) the nature of the security, i.e., the Property and its value, and (iii) the duration and feasibility of the Plan.[51]  As quoted recently by Judge Nelms in *In re Texas Grand Prairie*, the ruling in *Till* is succinct – "The court should aim to ensure that an objective economic analysis would suggest that the debtor's interest payments will adequately compensate all creditors for the time value of their money and the risk of default."[52]  This Court has also identified that *Till* directs an objective inquiry but that "the court is not required by *Till* to limit return on claims to the prime plus zero to three percent range used by the plurality in *Till* to

---

[49] 11 U.S.C. § 1129(b)(2)(A)(II).

[50] *See, e.g., Till v. SCS Credit Corp.*, 541 U.S. 465, 478-79 (2004); *T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *In re Northwest Timberline Enter., Inc.*, 348 B.R. 412, 423 (Bankr. N.D. Tex. 2006); *In re Mirant Corp.*, 334 B.R. 800, 821-22 (Bankr. N.D. Tex. 2005); *In re SJT Ventures, LLC*, 441 B.R. 248, 254-56 (Bankr. N.D. Tex. 2010); *In re Texas Grand Prairie Hotel Realty, LLC*, Case No. 10-43242.

     It is important to note that the Fifth Circuit, addressing *Till*, has circumscribed that holding as follows: "A plurality of four justices, joined by Justice Thomas who concurred in the judgment, reversed the Seventh Circuit and held that the prime-plus rate was the appropriate risk-adjusted rate to use for installment payments to creditors holding a crammed-down secured claim in a Chapter 13 plan."  *Drive Fin. Servs., L.P. v. Jordan*, 521 F.3d 343, 348 (5th Cir. 2008).  Additionally the Court noted that the *Till* approach is binding precedent in cases "presenting an essentially indistinguishable factual scenario."  *Id.* at 350.

[51] *Till*, 541 U.S. at 477.

[52] *In re Texas Grand Prairie*: 22:10-13 (quoting *Till*, 541 U.S. at 479).

determine the secured creditor's cram down rate."[53]  And, the risk premium is to be "based on the specific risks shown by the evidence . . . ."[54]

72.     Here, the Debtor proposes to pay interest only to Western for three years at a cramdown rate of 5.83%.  Even with this below-market rate,[55] the risk of default is high, given that the Debtor's cash position is the result of not making payments and then making interest-only payments.  Moreover, given the fact that the Property is only 78% occupied, the Debtor could not possibly obtain a rate of interest this low in the marketplace outside of bankruptcy.  Bo Brownlee has admitted as much confirming that a 5.83% interest rate is not reflective of a blended rate that the Debtor could actually obtain in the marketplace.  Given the extremely high loan to value ratio of the Western debt, if the Debtor were to obtain financing in the marketplace, such financing would involve three components: first lien financing, mezzanine financing and equity portion financing.  The blended rate of interest obtainable in the marketplace on such a financing structure is much higher than the Debtor's proposed cramdown rate of 5.83%.  Therefore, the proposed treatment of Western's claim is neither fair nor equitable, and fails to provide Western with a payment stream having a present value equal to Western's claim.  Consequently, the Debtor's Plan fails under section 1129(b)(2).

## C.     The Collateral Release Provision Is Illusory.

73.     The Plan proposes that the new loan documents to be issued in connection with Western's debt contain provisions allowing for release of Western's lien on portions of the Property sold or refinanced.  In order for the lien release provisions to be triggered, the Debtor would have to pay all net proceeds from the sale or refinancing to Western and the resulting

---

[53] *In re Mirant*, 334 B.R. at 840.

[54] *Id.* at 822.

[55] Western is aware of this Court's view of the market as an "item of evidence."  *In re Mirant Corp.*, 334 B.R. at 822-23.  Relevant in the case *sub judice*, as articulated by the Court: the Debtor's credit-worthiness and attractiveness as an investment.  *See id.*  Given the Debtor's inability to roll the Notes out of the construction loan and further inability to refinance in the years prior to bankruptcy, the Debtor's creditworthiness is not strong.

loan to value ratio with respect to the remaining Western debt and Property could not exceed 75%. This proposal illusory option, not a viable reorganization strategy.

74.    The current loan to value ratio on Western's debt is as near as makes no difference, 100%. Therefore, for the collateral release mechanism to qualify as a viable reorganization option, one of two things must occur: (1) the Debtor must make one or more substantial payments of principal to reduce the Western debt prior to any sale or refinancing of a portion of the Property, or (2) the value of the Property must dramatically increase. The Debtor can produce zero evidence that either will occur.

75.    With respect to reduction of principal, the Plan itself evidences that this cannot occur. The Debtor is proposing to pay interest only for three years at a woefully below-market rate. Even with below-market rate interest payments to Western and the proposed $1 million Preferred Equity injection, the Debtor is going to run out of money less than one year after confirmation. The Debtor has never paid a penny of principal on the Western debt, does not propose to do so for another three years, and has no evidence that it will be able to do so thereafter. Therefore, the idea that the Debtor could make the collateral release mechanism viable by significantly reducing the principal balance of Western's debt prior to a sale or refinancing of a portion of the Property is pure fantasy.

76.    Likewise, the Debtor can produce no evidence that significant appreciation in the value of the Property is likely to occur post-confirmation. In order for the collateral release mechanism to become viable based on appreciation of the Property, the appreciation would have to equal roughly 30% above stabilized value. Any assumption that such a dramatic increase in value is plausible cannot be grounded in reality, but can only be the product of viewing the world through rose-colored glasses. Therefore, the proposed collateral release provision is not a viable reorganization option and constitutes further evidence of the futility of the Debtor's Plan.

**D.**     **Issuance of the New Western Note will result in termination of the Title Policy Covering the Property.**

77.     Under the Plan, the Debtor proposes to replace the two promissory notes held by Western with the New Western Note.  Western is advised by its real estate counsel that if the existing Notes are replaced with the New Western Note, the title policy covering the Property will terminate.  Western is further advised that the cost of obtaining a new title policy will be substantial.  The Plan makes no provision for the Debtor obtaining a new title policy post-confirmation.  The Plan therefore fails in this respect to protect and preserve Western's interest in its collateral.

78.     Western is advised that if the existing loan documents are simply renewed and extended, rather than replaced by the New Western Note, an extension of the existing title policy can be obtained at little cost.  Western is providing the Debtor with draft loan documents extending and renewing the existing documents to address the issue of potential loss of the title policy.  Western asserts that the treatment of Western's claim cannot be approved unless the Court directs one of the following: (1) that the Debtor enter into loan documents to extend and renew the existing documents to allow for maintenance of the existing title policy at minimal cost, or (2) that, if the existing loan documents are to be replaced by the New Western Note, the Debtor obtain and fund, on the Effective Date, a new title policy covering the Property, which new policy must provide equal or greater coverage as the existing policy.

**E.**     **The Plan Fails to Provide for Financial Reporting by the Debtor to Western Post-Confirmation.**

79.     Under the original construction loan agreement, the Debtor is required to provide to Western various reports and documentation with respect to the Debtor's finances.  Such reporting requirements include, *inter alia*, the Debtor's obligation to:

a.     Within 90 days of the end of each calendar year, furnish Western with unaudited financial statements;

b.      Within 30 days of the end of each calendar quarter, furnish to Western, upon Western's request, then-current unaudited financial statements;

c.      Within ten days of the end of each calendar month, furnish to Western an operating report itemizing income and expenses for the operation of the Property for the immediately preceding month and a current rent roll prepared as of the last day of the immediately preceding month;

d.      At the same time as the Debtor submits it to the IRS, furnish to Western a copy of the Debtor's Form 1065 U.S. Partnership Return of Income for each calendar year;

e.      Allow Western to review and copy the Debtor's books and records; and

f.      Provide copies of all lease documents to Western and obtain advance approval from Western as to the form and substance of any proposed lease of more than 7,500 square feet of space at the Property.

80.    The Plan makes no provision for any of these reporting obligations to continue post-confirmation with respect to the New Western Note.  Nor does the Plan provide for any continuing oversight of Western with respect to any leases the Debtor may propose to enter into post-confirmation.  The Plan is therefore unconfirmable as proposed, because the proposed treatment of Western's claim unfairly strips Western of its ability to effectively monitor the Debtor's business operations.

81.    The reporting requirements included in the original loan documents are reasonable.  The sort of documents these requirements obligate the Debtor to prepare are the sort of financial documents the Debtor should be preparing in the responsible conduct of its business in the first instance.  Thus, the reporting requirements do not place any undue burden on the Debtor or interfere with the Debtor's business operations.  Western asserts that if it is forced to extend a post-confirmation loan to the Debtor, the Debtor must remain subject to and satisfy all the reporting requirements set forth in the original construction loan agreement.  Likewise, the Debtor should be prohibited from entering into any new lease post-confirmation

without first providing Western with a copy of the proposed new lease and obtaining Western's approval of the form and substance of the same.

**F.    The Temporary Injunction Contained in the Plan Cannot be Approved and Further Illustrates the Debtor's Lack of Good Faith.**

82.    The Debtor's indebtedness to Western is guaranteed by Beverly Diane Butler, David W. Burgher, Jr. and Bo Brownlee (collectively, the "Guarantors"), each a non-debtor third party.  At no time prior to or after the Petition Date has Western commenced any lawsuit against the Guarantors or attempted, in any other manner, to collect on the guarantees.  Nor has Western ever threatened to initiate any form of collection action against the Guarantors.  Despite this lack of action or threatened action by Western, the Debtor has included a section 105 "temporary" injunction in the Plan that would enjoin Western from taking any action against the Guarantors to collect on the guarantees as long as the Debtor is performing its obligations under the Plan.[56]  This injunction hardly qualifies as temporary, as it would prohibit Western from exercising its rights against the Guarantors for five (5) years.[57]  In any event, temporary or not, the injunction cannot be approved and the Plan cannot be confirmed with the injunction intact.

83.    A temporary injunction issued by a bankruptcy court under section 105 of the Bankruptcy Code may only be granted in accordance with the same rules governing issuance of a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.[58]  The prerequisites to granting such an injunction are:

---

[56] *See* Plan at Article X(B)(3).

[57] While the injunction, as proposed, is far from temporary, Western notes that, in reality, it would surely prove to be just that.  The Debtor's Plan is not feasible and the Debtor will not be able to perform for even one year post-confirmation before defaulting on its obligations to Western.  Per the terms of the proposed injunction, any default left uncured for 30 days after the Debtor's receipt of written notice of the default will result in dissolution of the injunction.

[58] *Commonwealth Oil Ref. Co., Inc. v. United States EPA (In re Commonwealth Oil Ref. Co., Inc.)*, 805 F.2d 1175, 1188 (5th Cir. 1986) *cert. denied* 483 U.S. 1005 (1987); *Am. Imaging Servs., Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 963 F.2d 855, 858 (6th Cir. 1992); *accord Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 765 (5th Cir. 1995).

(1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and (4) that the granting of the injunction will not disserve the public interest.[59]

84.     At no point in the Disclosure Statement or Plan – and at no other point during this case – has the Debtor even attempted to provide an explanation as to why a five-year "temporary" injunction against Western pursuing the Guarantors is either necessary or appropriate.  Absent a showing by the Debtor that such an injunction is justified in light of the above factors, the Court has no basis to grant the injunction.  That the Debtor has yet to offer any justification for the injunction is not surprising, as the Debtor cannot possibly demonstrate that the injunction is appropriate under the above factors.   As demonstrated below, such an injunction is completely inappropriate for the purpose of protecting equity.

85.     First, in this setting, the factor requiring a substantial likelihood of success on the merits relates to the Debtor's prospects for a successful reorganization.[60]  The Debtor cannot pass this test because the Plan is patently unfeasible.  In order for the Debtor to perform under the Plan, the Debtor must achieve a level of success in its operations far exceeding the highest level at which it has performed at any point in its entire history and must do so almost immediately post-confirmation.  While "substantial likelihood of success" does not require a guarantee of success, it requires more than a hypothetical possibility that a debtor might survive on a wing and a prayer, which is more than can be said of the Debtor's prospects for successful reorganization under the Plan.  Indeed, the Debtor has admitted that it has "no specific plans" to increase occupancy.[61]   Yet, the feasibility of the Plan depends on stabilizing the Property.

---

[59] *In re Commonwealth Oil*, 805 F.2d at 1189.

[60] *See In re Eagle-Picher*, 963 F.2d at 859-60.

[61] Transcript V: 94:7-21.

86.     Second, the Debtor can point to no substantial threat of irreparable injury if the injunction is not granted.  A threat of irreparable injury to a debtor's efforts to reorganize cannot exist if a debtor's reorganization plan is unfeasible and doomed to fail in the first instance. Whether Western attempts to collect from the Guarantors or not, the inescapable fact remains that the Debtor is incapable of performing under the Plan.  Moreover, the Debtor can point to no actual threat that Western may seek to collect from the Guarantors.  Western has never made any such threat prepetition or postpetition.  Therefore, any claim by the Debtor that there is threat of irreparable injury based on an attempt by Western to collect from the Guarantors is mere speculation of the part of the Debtor.

87.     Finally, no public interest is served if the injunction is granted.  The injunction is not necessary to protect the interests of the Debtor's unsecured creditors[62] (who hold approximately 0.2% of the claims against the Debtor in this case).  If the Court denies confirmation and lifts the automatic stay to allow Western to foreclose on the Property, Western will immediately pay the approximately $60,000 in unsecured debt.  If the Plan is confirmed, the unsecured creditors will be paid from cash available on the Effective Date within three (3) months.  Thus, the granting of a five (5)-year "temporary" injunction cannot be based upon the protection of the interests of the unsecureds.  The proposed injunction is nothing more than an overreaching, impermissible attempt to benefit equity.

88.     In the past, this Court has articulated that an impermissible injunction may doom confirmation via section 1129(a)(1) of the Code.  *See In re Gen. Electrodynamics Corp.*, 368 B.R. at 550.  Because the proposed injunction in the Plan is inconsistent with Fifth Circuit case law and the Code, the Plan cannot be confirmed for its failure to comply "with the applicable provisions of [title 11]."[63]

---

[62] *See Id.* at 861 (bankruptcy court's concern about potential impact on creditors of litigation to be enjoined was interpreted as a determination that the injunction served the public interest).

[63] 11 U.S.C. § 1129(a)(1).

## VI.    <u>CONCLUSION</u>

89.    The Debtor's Plan illustrates that the Debtor's chapter 11 is an attempt to benefit equity holders at the expense of its secured lender.  Along with the Debtor's inability to meet the tests under sections 1129(a)(1), (a)(3), (a)(9), (a)(10), (a)(11), and (b)(2), the Debtor's blatant disregard for the Court's directives regarding a capital infusion and the Debtor's inability to obtain the necessary capital to move the Property to stabilization dictate that confirmation must be denied.  Additionally, a Plan that pays equity double that of the secured creditor, whose debt is not amortized until year four of the Plan, cannot be found to square with the policies and objectives of the Bankruptcy Code.

WHEREFORE, Western respectfully requests this Court deny confirmation of the Plan and grant the relief requested by Western is its Motion for Relief from the Automatic Stay, and grant Western such other and further relief as the Court may deem just and proper.

DATED:  May 17, 2011.                  Respectfully Submitted,

By:  /s/ J. Robert Forshey
J. Robert Forshey
State Bar No. 07264200
Matthew G. Maben
State Bar No. 24037008
Kristin Schroeder
State Bar No. 24037452
FORSHEY & PROSTOK, L.L.P.
777 Main Street, Suite 1290
Fort Worth, TX 76102
(817) 877-8855 (817) 877-4151 fax
bforshey@forsheyprostok.com
mmaben@forsheyprostok.com
kschroeder@forsheyprostok.com

ATTORNEYS FOR WESTERN REAL ESTATE
EQUITIES, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2011, a copy of the foregoing document was served via ECF notification to all the parties receiving notice via CM/ECF and to the party listed below via email.

J. Mark Chevallier
MCGUIRE, CRADDOCK & STROTHER, P.C.
2501 N. Harwood, Suite 1800
Dallas, TX 75201
mchevallier@msclaw.com


/s/ Kristin Schroeder


L:\BFORSHEY\Western Real Estate Equities (Village at Camp Bowie) #5383\Pleadings\Obj to Confirmation of Debtor's Second Amended Plan - 5.17.11.docx