

US BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed August 04, 2011**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| VILLAGE AT CAMP BOWIE I, L.P., | § | |
| | § | |
| DEBTOR. | § | CASE NO. 10-45097 (DML) |
| | § | |

## MEMORANDUM OPINION

Before the court is the *Second Amended Plan of Reorganization of Village at Camp Bowie I, L.P.* (the "Plan").[1] Confirmation of the Plan was opposed by Western Real Estate Equities, LLC ("Western"), which filed its *Objection to Confirmation of the Debtor's Second Amended Plan of Reorganization and Renewed Motion for Relief from the Automatic Stay* (the "Objection"), including authorities supportive of the Objection.

---

[1]    Debtor filed the Plan on May 4, 2011. On May 17, 2011, Debtor filed its *First Modification to Debtor's Second Amended Plan of Reorganization* (the "Modification"). The court's findings regarding confirmation consider the Plan as amended by the Modification.

Debtor then filed its *Memorandum Supporting Confirmation of Its Second Amended Plan of Reorganization*, in which it provided authorities.

The court conducted a confirmation hearing respecting the Plan over three days, May 19, 2011, June 7, 2011, and June 23, 2011 (together, the "Hearing"). During the Hearing the court heard testimony of Woodrow (Bo) Brownlee ("Brownlee"), a principal of Debtor, John Sledge ("Sledge"), a principal of Western, Dr. Allyn Bryant Needham ("Needham"), Debtor's expert witness respecting the interest rate necessary to return the present value of Western's claim over time, and Paul French of Lain, Faulkner & Co., P.C., ("French"), Western's interest rate expert. The court also received into evidence exhibits identified as necessary below.

The court will consider prior proceedings in this case, specifically including hearings respecting Western's original *Motion for Relief from the Automatic Stay and Adequate Protection* (respectively, the "Stay Hearing" and the "Stay Motion").[2] The court does so with the agreement of the parties and pursuant to case law authorizing consideration of other case proceedings in connection with a contested matter. *See Nantucket Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs. Ltd.)*, 61 F.3d 197, 205 (3d Cir. 1995); *In re Mirant Corp.*, 348 B.R. 725, 729 (Bankr. N.D. Tex. 2006); *In re Alexander*, 284 B.R. 626, 629 (Bankr. N.D. Ohio 2002).

This contested matter is subject to the court's core jurisdiction. *See* 28 U.S.C. §§ 1334 and 157(b)(2)(L) and (O). This memorandum opinion contains the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052 and 9014.

---

[2]     Evidence offered at the Stay Hearing is particularly relevant to the value of the Property (as defined below) and the amount of the debt to Western. During the Stay Hearing, the court heard testimony from expert appraisers Ben Loughry ("Loughry") on behalf of Western and Alan Pursley ("Pursley") on behalf of Debtor.

## I.  Background

Debtor owns a low-rise, mixed-use development in southwest Fort Worth, Texas, known eponymously as the Village at Camp Bowie (the "Property").[3]  The Property occupies 23.08 acres in an excellent location in one of the busier areas of the city.  Space in the Property is leased for office, retail, restaurant and entertainment purposes.  The Property is presently slightly less than 80% occupied.

Debtor, a partnership, acquired the Property in 2004.   In addition to equity investment which, up to the time of commencement of this case, totaled approximately $10,000,000, Debtor executed documents to borrow up to $36,535,000 from SouthTrust Bank ("SouthTrust") and Texas Capital Bank, National Association ("TCB") on a short-term basis, partly for purchase of the Property and partly for refurbishing it.  The loan was financed by a promissory note in the original maximum principal amount of $26,535,000, payable to the order of SouthTrust (the "SouthTrust Note"), and a second promissory note in the original maximum principal amount of $10,000,000, payable to the order of TCB (the "TCB Note" and, with the SouthTrust Note, the "Notes").  At commencement of this case, Debtor calculated the principal and interest owed on the Notes as $32,264,938.

Wachovia Bank, N.A. ("Wachovia") became successor by merger with SouthTrust to the SouthTrust Note and successor by assignment to the TCB Note.  Wells Fargo Bank, N.A. (the "Bank") became successor in interest to the Notes by merger with Wachovia.

---

[3]     The Property also includes between four and five acres of excess land.  Though at the Stay Hearing the parties broke out the value of the excess land, the court will not here differentiate between it and the rest of the Property.

The original maturity date of the Notes was January 22, 2008, but the Bank entered into a series of modification agreements with Debtor on January 18, 2006, November 20, 2006, October 22, 2008, and February 11, 2009. As a result of these modifications, the Notes ultimately matured on February 11, 2010. The principal amount owed by Debtor on that date was $31,292,824. Debtor became in default on the Notes at their maturity, and that default was followed by a series of forbearance agreements executed on April 4, 2010, April 30, 2010, and June 16, 2010, by which the Bank agreed to forego temporarily the exercise of its remedies with respect to the loan during the forbearance period, which was extended a final time to July 9, 2010.

After the expiration of the forbearance period, the Bank decided to auction off the Notes. Western acquired the Notes at a discount and posted the Property for August 2010 foreclosure. This case was commenced voluntarily on August 2, 2010.

Western assumed its position as a secured creditor of Debtor in order to acquire the Property. Western is not in the lending business, and, as Sledge testified, it wishes to own and operate the Property. *See*, *inter alia*, TR (Sledge) November 22, 2010 at 49:5-14.[4] Western, accordingly, had no interest in negotiating Plan treatment acceptable to it with Debtor.

Western filed the Stay Motion on August 10, 2010. The court conducted the Stay Hearing over six days.[5] During the Stay Hearing, Debtor presented testimony from

---

[4]    Cites to the transcript of proceedings are formatted as TR ([Witness]) [date] at [page number]:[line number]. Cites to the audio recording of a proceeding are formatted as Audio ([Witness]) [date] at [hour]:[minute]:[second].

[5]    November 22, 2010, November 30, 2010, December 16, 2010, January 26, 2011, February 28, 2011, and March 3, 2011.

Pursley, an appraiser with Appraisal Source, Inc.,[6] that the value of the Property was $38,400,000. Western offered testimony from Loughry, an appraiser with Integra Realty Resources, that the value of the Property was $28,400,000.

At the conclusion of the Stay Hearing, the court announced that the stay would not lift. The court further stated that there was a small amount of equity in the Property above Western's lien. The court now specifically finds the value of the Property to be $34,000,000.

At the time of the Stay Hearing Debtor had filed a plan that called for an infusion of equity capital of $600,000.[7] However, those contributing the capital were to receive from the outset preferential dividends of 12% per year, and the court advised that it would not consider confirming a plan unless the equity infusion exceeded $1,000,000 and those contributing the equity received no return until creditors, including Western, had been paid. Subsequently, Debtor filed the Plan, which includes provision for infusion of $1,500,000, and otherwise conforms to the court's directions.[8]

Besides Western, Debtor owes general unsecured creditors approximately $60,000. Under the Plan the latter will be paid in three equal monthly installments commencing on the effective date of the Plan. *See* Plan, art. (III)(B)(2). Western's claim will be satisfied by interest-only payments (Debtor proposes an interest rate of 5.83%) for three years, followed by two years of payments of interest and principal amortized over

---

[6]     Debtor originally designated Ben E. Dyess Jr. ("Dyess") of Ben Dyess & Associates as its appraiser, but the court sustained a challenge to Dyess's expert report based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* TR January 7, 2011 at 85:22.

[7]     *See Original Plan of Reorganization of Village at Camp Bowie I, L.P.*, art. V(B).

[8]     *See* Modification, ¶ 2.

30 years.  At the end of five years, Western's remaining debt is to be paid in full.  *See* Plan, arts. (II)(A) and (III)(B)(1)(b).

The Plan designates only two voting, impaired creditor classes: Western (class 1) and the unsecured creditors (class 2).[9]  The third designated class (class 3) is made up of equity owners.  Western, unsurprisingly, given its goal of ownership of the Property, voted to reject the Plan.  All of the class 2 creditors voted to accept the Plan.[10]  At the Hearing, sufficient evidence was presented to satisfy the court that the Plan met all requirements for confirmation under Code § 1129(a) except section 1129(a)(8) (acceptance by all classes), and those requirements discussed below.  Because the Plan must be confirmed, if at all, under section 1129(b), it must satisfy all tests of section 1129(a) other than that of section 1129(a)(8), and must also satisfy section 1129(b)(1) and (2)(A) pertaining to secured claims.

## II.  Western's Objections

Western objects to confirmation of the Plan based on Code §§ 1129(a)(1), (3), (9), (10), (11) and (b)(2)(A)(i).  These objections are based on the following: (1) the Plan contains improper releases; (2) the Plan is intended only to benefit equity; (3) the Plan artificially impairs class 2 creditors; (4) the Plan provides for payment of a return to new equity in preference to Western; (5) Debtor will be unable to make payments called for by the Plan (including payment of actual administrative claims), thus failing the tests of Code § 1129(a)(9) and (11); and (6) the Plan provides Western with an interest rate inadequate to return to Western the present value of its claim.

---

[9]        The Plan designates no unimpaired class.

[10]        *See* section 1129(a)(7)(A)(i) of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Code").

Debtor has modified the Plan to eliminate the release provision and the preferential return to new equity.  *See* Modification, ¶ 2.  Moreover, the infusion of $1,500,000, as testified to by French (*see* Audio (French) June 23, 2011 at 3:47:05-3:48:21), ensures that the Plan is feasible and that payments required by Code § 1129(a)(9) can be made by Debtor.  The court does not consider an effort by a debtor to preserve equity for its owners to be a basis, standing alone, for denying confirmation of the Plan.  Thus, the court finds and holds that the Plan is feasible and otherwise confirmable provided that it is not tainted by an artificial impairment of class 2 and that it provides present value to Western for its claim as required by Code § 1129(b)(2)(A)(i).  The court will address these issues below.

### III. Discussion

A.  Artificial Impairment

Artificial impairment refers to the technique of minimally impairing a class of creditors solely to satisfy the prerequisite to cramdown of an accepting class.[11]  But the words of the statute do not require denying confirmation of a plan on the basis that artificial impairment has been used to satisfy Code § 1129(a)(10).  Indeed, it is not clear which provision of section 1129(a) is offended by artificial impairment.  The leading case supporting the proposition that artificial impairment is improper, *Windsor on the River Associates, Ltd. v. Balcor Real Estate Finance, Inc.* (*In re Windsor on the River Associates, Ltd.*), 7 F.3d 127 (8th Cir. 1993), looked to Congress's intent in crafting section 1129(a)(10).  *Windsor*, 7 F.3d at 130-32.  However, most courts considering the

---

[11]      Section 1129(b)(1) requires, for cramdown, that all tests of section 1129(a) except that of 1129(a)(8) be met.  Section 1129(a)(10) requires acceptance of a plan by at least one class of impaired creditors.

doctrine look instead to the good faith requirement of section 1129(a)(3).[12]  *See B.M.*

*Brite v. Sun Country Dev., Inc.* (*In re Sun Country Dev., Inc.*), 764 F.2d 406, 408 (5th

Cir. 1985); *Sandy Ridge Dev. Corp. v. La. Nat'l Bank* (*In re Sandy Ridge Dev. Corp.*),

881 F.2d 1346, 1353 (5th Cir. 1989); *Conn. Gen. Life Ins. Co. v. Hotel Assocs. of Tucson*

(*In re Hotel Assocs. of Tucson*), 165 B.R. 470, 475 (B.A.P. 9th Cir. 1994); *In re Landing*

*Assocs., Ltd.*, 157 B.R. 791, 813 (Bankr. W.D. Tex. 1993).

Western contends – and Debtor cannot dispute – that there will be sufficient cash

on hand at confirmation of the Plan to pay unsecured creditors in full, with interest.

While, facially, payment in full does not constitute unimpaired treatment under section

1124,[13] many courts, including this one, have concluded that payment in full with interest

of a class of creditors on a plan's effective date leaves that class unimpaired.  *See In re*

*Texas Rangers Baseball Partners*, 434 B.R. 393, 406 (Bankr. N.D. Tex. 2010); *Solow*

*Building Co. v. PPI Enters. (U.S.), Inc.* (*In re PPI Enters. (U.S.), Inc.*), 324 F.3d 197,

205-07 (3d Cir. 2003); *In re G-1 Holdings Inc.*, 420 B.R. 216, 254-55 (Bankr. D.N.J.

2009); *In re PPI Enters.*, 228 B.R. 339, 354 (Bankr. D. Del. 1998).

Given that the definition of impairment in Code § 1124 is clear – and broad – and

given that Congress did not, as it might have, condition the accepting class requirement

---

[12]      The reasoning of the *Windsor* Court has been rejected outside of the Eighth Circuit.  *See L & J*
*Anaheim Assocs.*, 995 F.2d at 943 (rejecting any narrowing of the definition of impairment in
construing section 1129(a)(10)); *Tucson*, 165 B.R. at 475 (explaining that the fact that a debtor
could leave a class unimpaired does not change the class's status from impaired to unimpaired; it
is not the bankruptcy court's role to determine whether alternative payment structures could
produce a different result regarding impairment).

[13]      Prior to 1994, payment in full was statutorily defined as unimpaired treatment.  *See* former Code §
1124(3).  However, there was a question about whether creditors were entitled to post-petition
interest in order for their claims to be unimpaired.  To avoid decisions like *In re New Valley Corp.*,
168 B.R. 73 (Bankr. D.N.J. 1994), in which a solvent debtor left a class unimpaired without
paying post-petition interest, Congress eliminated that alternative form of unimpairment.  The
legislative history specifically relates the change "to the award of post-petition interest."  H.R.
Rep. No. 103-835, at 47-48 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3356.

of section 1129(a)(10) on meaningful impairment of that class,[14] the latter section cannot be read to require any particular degree of impairment.[15]  Meeting the test of section 1129(a)(10) requires only that a "class of claims that is impaired . . . accept[ ] the plan . . . ." *See* Code § 1129(a)(10).  Thus, any impairment, so long as the class (excluding the vote of insiders) accepts the plan, satisfies that provision.  To hold otherwise would unnecessarily frustrate Congress's evident intent to give "impairment" the broadest possible meaning.  *See In re J & L Anaheim Assocs.*, 995 F.2d 940, 942-43 (9th Cir. 1993); *In re Madison Hotel Assocs.*, 749 F.2d 410, 418 (7th Cir. 1984); *Di Pierro v. Taddeo* (*In re Taddeo*), 685 F.2d 24, 28 (2d Cir. 1982); *In re Am. Solar King Corp.*, 90 B.R. 808, 819 (Bankr. W.D. Tex. 1988); *In re Elijah*, 41 B.R. 348, 351 (Bankr. W.D. Mo. 1984).[16]  Consequently, the *Windsor* Court's reliance on section 1129(a)(10) as a bar to artificial impairment appears to be misplaced.

The court therefore concludes that, if the Plan is to fail confirmation due to artificial impairment, it must be because Debtor did not propose the Plan in good faith as required by section 1129(a)(3).  The generally applicable test for good faith under section 1129(a)(3) is that the plan has been "proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success."  *Sun Country*, 764 F.2d at 408.  There

---

[14]    For example, in sections 222 and 364 of the former Bankruptcy Act, Congress conditioned a vote on modification of a plan on the modification "materially and adversely" affecting the treatment of the class.

[15]    Moreover, the desirability of leaving it to the courts to decide how much impairment is enough is questionable.  If the court must judge sufficiency of impairment, a new litigable issue has been added in an area where there are already more than sufficient bases for dispute.

[16]    Usually the breadth of section 1124 favors creditors, giving them a vote on almost any change in their rights, and so ensuring them a voice in the confirmation process.

is no question that the Plan meets this test: Debtor clearly proposed it with an honest

intent that its debt be restructured, and the plan is feasible and so is likely to succeed.

But the broader statement of the good faith test requires that the court consider

"the totality of circumstances surrounding establishment of a Chapter 11 plan." *Id.* It is

into this analysis that the court must factor Debtor's treatment through minimal

impairment of class 2 under the Plan. *See Sandy Ridge*, 881 F.2d at 1353.

It seems clear that, in the usual case, artificial impairment does not amount per se

to a failure of good faith.[17] Rather, it is one factor that the court may consider in its

analysis under Code § 1129(a)(3). *See Sandy Ridge,* 881 F.2d at 1353; *In re*

*Consolidated Operating Partners, L.P.*, 91 B.R. 113, 116 (Bankr. D. Colo. 1988).

Indeed, at least one court has persuasively suggested that the drafters of the Code did not

intend to create a system in which – even in a single asset real estate case – a lender could

use its overwhelming share of the claims in a case to divest other creditors and equity

owners of their economic interests. *See Consolidated Operating*, 91 B.R. at 116. Yet the

only way around control of the reorganization by a debtor's lender in a case like that at

bar is through impairment and an affirmative vote of a class of unsecured creditors who

will typically have small claims that could be readily satisfied through full payment with

interest. For a debtor to have any leverage at all in such a case – e.g., in negotiations – it

must be possible to look to those unsecured creditors to satisfy section 1129(a)(10).

---

[17]     Though there may be a case where artificial impairment, standing alone, would constitute bad
faith, this is not that case.

Western argues that Debtor's purpose – motive[18] – in this chapter 11 case is to preserve equity. The court does not doubt this. But Congress clearly contemplated in the Code protecting equity interests as well as those of creditors. A committee may be appointed to represent equity owners "to assure [their] adequate representation." Code § 1102(a)(2). Appointment of a trustee or examiner may turn on the interests of equity owners. Code § 1104(a)(2) and (c)(1). Equity owners have a right to "appear and be heard on any issue in a [chapter 11] case." Code § 1109(b). An equity committee or an individual equity owner may file a plan once the debtor's exclusive period has expired. Code § 1121(c). A plan must contain "only provisions that are consistent with the interests of creditors *and equity security holders*." Code § 1123(a)(7) (emphasis added). A plan must provide as much value to equity owners as they would receive in liquidation. *See* Code § 1129(a)(7). And a plan may be confirmed over the dissent of a class of equity owners only if it meets the requirements of Code § 1129(b).

Given Congress's obvious concern for fair treatment of equity owners, the court cannot fault Debtor's concern for its equity owners. Indeed, the Court of Appeals for the Seventh Circuit did not find improper a debtor's desire to save its equity owners from unfavorable tax consequences in assessing the debtor's good faith in proposing a plan. *See In re 203 N. LaSalle Street P'ship*, 126 F.3d 955, 969-70 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434 (1999). In that case, moreover, the effect of the plan was to strip down the principal lender's lien to the value of the collateral, providing only a 16% return on the lender's deficiency. *See id*. at 969.

---

[18]     Courts often focus on a debtor's motives in assessing good faith. *See, e.g., In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir. 1985) (explaining that a finding of lack of good faith is warranted when "there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights" (citing *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984))).

In the case at bar, Western will receive under the Plan the full value of its claim. That Debtor can only accomplish its restructuring – including preservation of equity interests – through minimal impairment of class 2 does not mean its motive in pursuing chapter 11 relief is tainted, as might be true if the case were initiated solely to gain the benefit of the automatic stay or to strip down debt.

If any party has a questionable motive in this case, it is Western. By bidding in the Bank's debt at a discount,[19] Western hoped to acquire the Property for less than its fair value. While this is not illegal or immoral,[20] courts have declined to count creditor votes where the creditor's motive in voting was to displace the debtor. *See Landing*, 157 B.R. at 807-08; *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 293 (Bankr. W.D. Pa. 1990). In the case at bar, where Western's goal is elimination of Debtor, it is but a small step in assessing Debtor's good faith to weigh Western's motives against its allegations that Debtor is guilty of bad faith by reason of artificial impairment.

Certainly this case does not present a situation where artificial impairment was used simply to avoid negotiation with the debtor's principal secured creditor. The only option available to Debtor if it was to retain value for equity was to file under chapter 11 and use the small class of unsecured creditors to satisfy the requirement of section 1129(a)(10) so that it could impose cramdown treatment on Western. In another case artificial impairment might be evidence of a lack of good faith. In this case, facing a

---

[19] Sledge testified that Western purchased the Notes for $26.7 million. TR (Sledge) November 22, 2010 at 20:14-16.

[20] The court will take this opportunity to commend Western's counsel for his conduct during this case. Counsel has been as effective and zealous an advocate as the court has ever seen, yet has acted in an impeccably professional manner throughout the case.

creditor that will not be satisfied other than by cash payment in full or the demise of Debtor, the court cannot make such a finding.

The Court of Appeals for the Fifth Circuit has not directly addressed the issue of artificial impairment. The opinion that comes closest to doing so – that of Judge Reavely in *Sun Country* – suggests that *Windsor* is not good law in the Fifth Circuit. In that case, the debtor modified its plan from providing full payment (which, at that time was unimpaired treatment under section 1124) of unsecured creditors that were owed only $3,805 in order to create an accepting class that would satisfy section 1129(a)(10). The court was not troubled by the rather obvious manipulation, stating:

> [The lender's] claim that the unsecured creditors' status was changed to effectuate the cram down does not go to whether the purpose of Sun Country's proposed plan is to reorganize or whether the plan has a reasonable hope of success. Congress made the cram down available to debtors; use of it to carry out a reorganization cannot be bad faith.

*Sun Country*, 764 F.2d at 408.[21]

Western's argument that the decision of the Court of Appeals in *Phoenix Mutual Life Insurance v. Greystone III* (*In re Greystone*), 995 F.2d 1274 (5th Cir. 1991), requires a different result is inapposite. That case involved a misuse of Code § 1122(a), which sets no specific test for division of claims into classes, but simply imposes one requirement on classification. Section 1124, in contrast, provides a clear definition of impairment. If that broad definition usually protects creditors, that does not mean that, where suitable, it cannot assist a debtor.

---

[21] Western notes that the *Sun Country* Court also relied on a lower court finding that impairment of the unsecured creditors was necessary. But, leaving aside that that reliance was not required by the Court's holding, the *Sun Country* Court could have done as the *Windsor* Court did – apparently on its own motion – and found the trial court's determination respecting the debtor's reason for the minimal impairment to be "clearly erroneous." *See Windsor*, 7 F.3d at 132.

In the case at bar, Debtor has done no more than author a plan that fits the plain meaning of sections 1124 and 1129(a)(10).  As the *Sun Country* Court opined, Debtor has simply used the tools created by Congress to structure a reorganization plan that is likely to succeed.  That cannot amount to bad faith, as would a manipulation of classification that is meant to isolate and neutralize a lender's large deficiency claim, the situation presented by *Greystone*.

Finally, Western argues that this court, in its opinion in *In re Texas Rangers Baseball Partners*, disapproved of artificial impairment.  *See* 434 B.R. at 410.  It is true that the court stated there and continues to believe artificial impairment should not be *encouraged*; that does not mean it is never permissible.  Where a fair and equitable restructuring may be accomplished only through artificial impairment, it should not be prohibited.  In the case at bar, where the court has found value available to equity, it would be contrary to the requirements of section 1129(b)(2)(C) to decline approval of the only plan that will achieve a fair and equitable result for both equity owners and creditors.[22]

In sum, the court does not find Debtor's treatment of class 2 in the Plan proof of bad faith.  Based on the totality of the circumstances, the court finds and concludes that the Plan was proposed in good faith and meets the test of Code § 1129(a)(3).

B.    Interest Rate

---

[22]    Equity interests are entitled to fair and equitable treatment, as are creditors.  The result of denying confirmation of a plan relying on minimal impairment of class 2 would be that Western, through the inevitable resulting foreclosure, would receive – at the expense of equity owners – more than its secured claim entitles it to.  Such a result is not fair and equitable to equity.  *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("[A] class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re MCorp Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) ("[C]reditors must not be provided for more than in full.").

Having determined that it satisfies all the requirements of Code § 1129(a) except

section 1129(a)(8), the Plan qualifies to be tested against section 1129(b) to determine if

it should be confirmed notwithstanding the dissent of class 1 – Western. Section 1129(b)

reads in pertinent part:

> (1) . . . [I]f all of the applicable requirements of subsection (a) of
> this section other than paragraph (8) are met with respect to a plan,
> the court, on request of the proponent of the plan, shall confirm the
> plan notwithstanding the requirements of such paragraph if the
> plan does not discriminate unfairly, and is fair and equitable, with
> respect to each class of claims or interests that is impaired under,
> and has not accepted, the plan.
> (2) For the purpose of this subsection, the condition that a plan be
> fair and equitable with respect to a class includes the following
> requirements:
> (A) With respect to a class of secured claims, the plan provides—
> (i) (I) that the holders of such claims retain the liens securing such
> claims, whether the property subject to such liens is retained by the
> debtor or transferred to another entity, to the extent of the allowed
> amount of such claims; and
> (II) that each holder of a claim of such class receive on account of
> such claim deferred cash payments totaling at least the allowed
> amount of such claim, of a value, as of the effective date of the
> plan, of at least the value of such holder's interest in the estate's
> interest in such property[.]

Western does not argue – nor would the court find – that the Plan discriminates

unfairly. Thus, the question for the court is whether the Plan is fair and equitable.

Section 1129(b)(2)(A) offers three options for treating a dissenting class of

secured creditors, and the Plan adopts the first option: the secured class must retain its

liens and must receive "deferred cash payments . . . of a value, as of the effective date of

the plan," at least equal to the amount of the class's secured claims. Whether the

payments provided to Western over the five year term proposed in the Plan have a value

equal to Western's secured claim depends on whether the interest rate – 5.83% –

provided under the Plan results in Debtor's obligation to Western having a present value

equal to the claim.

In determining whether the interest rate Debtor proposes is sufficient, the court

looks to *Till v. SCS Credit Corporation*, 541 U.S. 465 (2007), the Supreme Court's recent

statement respecting the interest rate necessary to meet the requirements of section

1129(b)(2)(A)(i).[23]   Faced with various approaches to establishing a cramdown interest

rate, the Court settled on a formula approach, though it suggested that in a chapter 11

case there might be an efficient market that would establish a proper rate for cramdown.[24]

In the case at bar, both French and Needham testified that no efficient market provides

loans of the sort required from Western by Debtor.  *See* Audio (Needham) June 23, 2010

at 2:11:30-57; Audio (French) June 23, 2010 at 10:05:20-36.  The court, therefore, will

use a formula approach for arriving at a correct interest rate.

Needham and French, in adopting a formula approach to calculating an

appropriate interest rate, each began with a "risk-free" rate and then added to it

components designed to account for risk.  *See Till*, 541 U.S. at 466-67.  Needham, like

the *Till* Court, used the prime rate as his base, while French used the five year treasury

---

[23]   *Till* was a chapter 13 case, but the operative language of the applicable provision, section 1325(a)(5)(B)(ii), is essentially the same as that in section 1129(b)(2)(A)(i), requiring similar treatment of a crammed-down secured creditor:

> [T]he value as of the effective date of the plan, of property to be distributed under the plan on account of such [secured] claim is not less than the allowed amount of such claim[.]

[24]   The Supreme Court pointed to several internet sites for the proposition that such a market exists. *See Till*, 541 U.S. at 476 n.14.  As of July 26, 2011, the web addresses for those sites are no longer active.  Based on the description of those sites in footnote 14 of the *Till* opinion, they appear to offer debtor-in-possession financing rather than financing for a debtor exiting chapter 11.  These websites are therefore inapplicable to the facts in this case.

note.  As this court has previously noted,[25] *Till*'s direction to use a formula approach to

fixing an interest rate does not require, from case to case, use of the prime rate, and the

court finds French's approach more thoughtful and better documented than that of

Needham.  The court will therefore use French's approach as its basis for calculating an

appropriate rate of interest.

Starting with the five year treasury bill rate of 1.71% as his risk-free rate, French

adjusted it to account for (1) risk factors he analyzed in his expert report, (2) a debtor-

specific risk factor and (3) an adjustment based on the term of the Plan that provides

Western with only interest for three years.  Of these, the debtor-specific risk factor is

sensitive to the value of Western's collateral and the amount of its debt.  The result of this

computation is a base – i.e., senior debt – interest rate of between 4.76% and 5.01%.[26]

Based on his research, French concluded that this "senior" component of his

aggregate interest rate would be applicable for a loan up to 65% of collateral value.

Thus, the extent of application of the senior rate would be limited, its coverage depending

upon the amount of Western's debt and the value of its collateral.

Having arrived at a rate for senior debt, the next step in French's formulation of

an appropriate overall interest rate was a rate for junior, or "mezzanine" debt.  Analyzing

the question of what rate would be charged by a junior – or mezzanine – lender, French

determined that a rate of 13.02% to 14.88% would be appropriate based on an overall

loan-to-value ratio of 85%.  Thus, the second component of French's interest rate would

cover the next 20% of value beyond the 65% allocated to "senior" debt.  Like the

---

[25]     *See In re Mirant Corp.*, 334 B.R. 800, 821-24 (Bankr. N.D. Tex. 2005)

[26]     The difference accounts for the difference between Pursley's opinion of the value of the Property
and that of Loughry.  As the court differs with both appraisers respecting value, it must choose a
rate that accounts for that difference.

"senior" debt, this rate is partially dependent, and the extent of its coverage turns, on the value of the Property and the amount of Western's claim.

The final element composing French's interest rate, before adjustment, consists of an "equity" band. Because, using Loughry's appraisal, debt exceeds 85% of the value of the Property, French posited, for purposes of calculating a rate using that appraisal, that a lender was entitled to a return on that portion comparable to an equity investor. French calculated this rate as 18.63%. As to this tranche, since, using Pursley's appraisal, Western's debt equals 84% of the value of the Property, French did not need to compute a second equity rate.

French next determined what percentage of the debt (Western's claim) was represented by each of the senior, junior and equity tranches. Using these proportions he calculated a combined interest rate of between 7% (using Pursley's appraisal) and 9.25% (using Loughry's appraisal). He finally adjusted these rates for the reduced risk at the junior debt and equity levels due to there being only one lender and to account for the benefits of bankruptcy, such as court supervision, determination of feasibility, etc. (*see Till*, 541 U.S. at 466; *Mirant*, 334 B.R. at 822). He calculated on that basis final interest rates of 6.25% and 7.75%.

While the court considers French's methodology an appropriate approach to use to determine an interest rate,[27] he worked with several flawed assumptions. First, he used the two values for the Property arrived at by the parties' appraisers. The value of the Property found by the court is $34,000,000 – roughly halfway between those values. To

---

[27] The court has not detailed here the data from which French derived his numbers. Suffice it to say that his research was extensive and well-planned. The court is satisfied that his opinions are defensible under the most rigorous *Daubert* analysis. *See* 509 U.S. at 592-95.

that $34,000,000 must also be added the proposed capital infusion of $1,500,000. In another type of case this might be inappropriate. But here, because Western holds an overwhelming share of the debt owed by Debtor, as that is likely to remain true (with the exception of ad valorem taxes, payment of which benefits Western) and as the $1,500,000, after payment of reorganization costs, will go to improve the Property or its occupancy, it is appropriate to count this amount in assessing the value available to satisfy Western.

On the other hand, French used $32,264,938 as the amount owed Western. This amount is too low because it does not allow for fees due Western's counsel. *See Western Real Estate Equities, LLC's Motion for Determination of the Amount of Its Secured Claim, and for All Allowance of Interest, Reasonable Fees, Costs and Charges Pursuant to 11 U.S.C. Section 506(b)* at 10-12. Also, the court must factor in likely reorganization costs. Since these numbers are not adequately established in the record (and probably could not have been), the court will use $33,000,000 as the amount of Debtor's debt to Western as an approximation effectively allowing for both these items.

Having pegged the debt to Western and the value of Debtor, the court will use the averages of French's interest spreads to determine a senior rate of 4.89%, a junior rate of 13.95% and an equity rate of 18.63%. Allocating these rates proportionally to the debt to Western, the court concludes that, prior to adjustments for a single lender and the benefits of bankruptcy, the overall rate of interest should be 7.422%.

French calculated a one-lender benefit at between .32% and .71% and the bankruptcy benefit at between .5% and .8%. The court believes the latter to be too high. The bankruptcy benefit in *Till* was partly attributable to the bankruptcy court's oversight

of the debtors during the performance of their plan. *See Till*, 541 U.S. at 471-72, 475. In *Mirant* the benefit of bankruptcy included resolution of numerous disputes and a concomitant improvement in the debtor's balance sheet. *See Mirant*, 334 B.R. at 834-35. In the case at bar, those benefits are not present. Unlike in the Tills' chapter 13 case, Debtor's discharge is not deferred until payments to Western are completed. *See* Code § 1141(d); *cf.* Code § 1328(a). As to Debtor's balance sheet, the effect of the Plan and the chapter 11 case is minimal. The principal benefit of Debtor's case then is the court's consideration of the Plan's feasibility, a benefit insufficient to justify a one-half percent reduction in the cramdown interest rate.

On the other hand, French included a profit to the lender of approximately .85% in his interest rate. The court does not believe lender profit should be included in determining an interest rate intended to provide present value to the lender. Without profit, an interest rate arguably leaves the lender where it would have been absent cramdown under the applicable plan, and that is all that section 1129(b)(2)(A)(i) promises. French, noting that prime rate theoretically provides a profit to a lender, assumed that, in using prime rate as a base for calculations, the *Till* Court approved of including a profit margin for the lender.[28] The Supreme Court, however, indicated nowhere in the plurality opinion in *Till* that its formula approach was intended to include an element of profit. Rather, the Court simply adopted prime rate as a useful starting

---

[28]     In fact, the Supreme Court in *Till* specifically rejected the forced loan approach, which would have included a profit for the lender. *See Till*, 541 U.S. at 477.

point in a formulaic calculation which, regardless of the marketplace,[29] would serve to provide present value.

Taking all these factors into account, the court concludes that the 7.44% interest rate should be adjusted downward by between .85% and 1.17%, to arrive at a cramdown rate of 6.27% to 6.59%. The court therefore concludes that the Plan cannot be confirmed based on an interest rate to Western of 5.83%. Should the Plan be amended to provide for an interest rate of at least 6.4%, the court would be prepared to confirm it, provided the further issues mentioned below are addressed.

C.      Other Issues

There remain several issues respecting Debtor's reporting requirements and documentation of Western's post-confirmation loan. Should Debtor modify the Plan to conform to the court's calculation of an appropriate interest rate,[30] the parties are directed to meet and confer respecting these issues. To the extent they are unable to resolve them, the court will set a hearing at which it will do so.

IV. CONCLUSION

For the reasons stated herein, the Objection is overruled in part and sustained in part. Confirmation of the Plan is denied without prejudice to its reconsideration if modified to conform to this memorandum opinion.

It is so ORDERED.

# # # # END OF MEMORANDUM OPINION # # # #

---

[29]    Indeed, it is incontestable that no lender would consider the formula set by *Till* – prime rate plus 1%, 2% or 3% – to provide a profit margin on a 100% loan-to-value used car loan.

[30]    Such a modification would fit within Fed. R. Bankr. P. 3019 and so no disclosure or solicitation would be required.